321 P.3d 655

Karen GOO, et al., Petitioners/Plaintiffs/Counterclaim-Defendants/Appellants/Cross-Appellees,

v.

Mayor Alan ARAKAWA, Successor–In–Interest to Mayor Charmaine Tavares, William Spence, Director of Planning, County of Maui, Successor–In–Interest to Director Jeff Hunt, County of Maui, Respondents/Defendants/Cross–Claim Defendants/Appellees/Cross–Appellants/Cross–Appellees,

and

VP and PK(ML) LLC, KCOM Corp., Defendants/Intervenor–Defendants/Cross–Claim Defendants/Counterclaimants/Cross–Claimants/Appellees/Cross–Appellees/Cross–Appellants,

and

Kila Kila Construction, Defendant/Cross–Claim Defendant/Cross–Claimant,

and

(John G.) John G's Design & Construction, Inc., Defendant/Cross–Claimant/Cross–Claim Defendant,

and

New Sand Hills LLC., Respondent/Defendant/Intervenor-Defendant/Counterclaimant/Cross-Claim Defendant/Appellee/Cross–Appellee/Cross–Appellant,

and

David B. Merchant; Joyce Takahashi; Brian Takahashi, Defendants/Intervenor–Defendants,

and

Diane L. Reaser, et al., Defendants/Intervenor–Defendants/Counter–Claimants,

and

Hookai, LLC, Sandhills Estates Community Association, Respondents/Intervenors/Appellees/Cross–Appellees/Cross–Appellants,

and

Cheryl Cabebe, Gerry Riopta, and Melissa Riopta, Intervenor–Defendants/Appellees/Cross–Appellants.

No. SCWC–30142.

Supreme Court of Hawai'i.

Feb. 19, 2014.

David J. Gierlach, Honolulu, and Lance D. Collins, for petitioners.

Patrick K. Wong, Caleb P. Rowe, Brian T. Moto, and Jane E. Lovell (Madelyn S. D'Enbeau on the briefs), for respondents Mayor Alan Arakawa, Successor–in–Interest to Mayor Charmaine Tavares, William Spence, Director of Planning, County of Maui, Successor–in–Interest to Director Jeff Hunt, County of Maui.

Ronald T. Ogomori, Nathan H. Yoshimoto, Honolulu, and T.F. Mana Moriarty, for respondents New Sand Hills, LLC., VP and PK (ML), LLC., KCOM Corp., and Sandhills Estates Community Association.

RECKTENWALD, C.J., NAKAYAMA, ACOBA, McKENNA, and POLLACK, JJ.

Opinion of the Court by POLLACK, J.

This case addresses the issue of the procedure that an appellate court should follow when a case becomes moot on appeal and one party seeks vacatur of the lower court's judgment.

We hold that the Intermediate Court of Appeals (ICA) erred in vacating the circuit court's judgments and December 31, 2008 Order Granting Partial Summary Judgment in this case and remanding the case for dismissal. In addition, we conclude that the ICA did not err in affirming the circuit court's denial of plaintiffs' request for attorneys' fees.

## I. Background

### A.

On Maui, approval of development projects is a three-phase process. Phase I involves approval of ordinances by the Maui County Council (Council) that include prescribing the height and density of structures to be built in a project. Phase II requires approval of the preliminary plat by the Planning Commission. Phase III requires the approval of the final plat by the director of the Department of Planning. According to the Charter of the County of Maui, the director of the Department of Planning is charged with enforcing the zoning ordinances. Maui County Charter § 8–8.3(6).

Approval of subdivisions requires the approval of various state and county agencies. Ultimately the planning director can approve subdivisions if they "conform to . . . the county general plan, community plans, land use ordinances, the provisions of the Maui County Code, and other laws relating to the use of land[.]" Maui County Code § 18.04.030 (1993).

At the time of the relevant events in this case, Title 19, Article II, of the Maui County Code (MCC), known as the Comprehensive Zoning Ordinance (CZO), stated that "[n]o building shall exceed two stories nor thirty feet in height." Prior to September 4, 1991, the CZO "definitions" section defined

"height" as the "vertical distance from finished grade to the highest point of the finished roof surface[.]" (pre–1991 definition) (Emphasis added).

On September 29, 1988, an application was filed for Phase I approval of the Maui Lani Project District (MLPD). On June 20, 1990, the Council enacted Ordinance 1924, which constituted Phase 1 approval for the MLPD. MCC Chapter 19.78, which codified Ordinance 1924, restricted structures in residential sub-districts to "two-stories, not exceeding thirty feet."

On September 18, 1990, the MLPD received Phase II approval when the Maui Planning Commission approved the MLPD's preliminary plat site plan.

## B.

On September 4, 1991, the Council enacted Ordinance 2031 (Height Restriction Law), which changed the definition of "building height." "Height" was defined as "the vertical distance measured from a point on the top of a structure to a corresponding point directly below on the natural or finish grade, whichever is lower." (post–1991 definition) (Emphasis added).

The Height Restriction Law also provided definitions for "natural grade" and "finish grade." "Natural grade" was defined as "the existing grade or elevation of the ground surface which exists or existed prior to manmade alterations such as grading, grubbing, filling, or excavating." "Finish grade" was defined as "the final elevation of the ground surface after man-made alterations such as grading, grubbing, filing, or excavating have been made on the ground surface."

On October 18, 2003, the Sandhills Project within the MLPD received preliminary subdivision approval, and on March 12, 2004, it received Phase III approval. According to former Planning Director Michael Foley (Planning Director), "[t]he Planning Department reviewed the project relative to the finished grade and did not consider the effect of fill on building heights." In other words, the Planning Department did not calculate fill into the allowable building heights of structures in the MLPD.

On August 2, 2004, the Department of Public Works and Waste Management issued a Grading and Grubbing Permit for the Sandhills project that included a warning that adding fill to any lots would "reduce the allowable height to less than 30 feet from finished grade." On the same day, the Fairways project within the MLPD received preliminary subdivision approval. The preliminary subdivision approval letter for the Fairways project included a similar warning concerning the effect of fill on building heights.

On December 14, 2004, the Planning Director sent an "Interdepartmental Transmittal" rescinding the Planning Department's recommendation of Phase III approval for the Sandhills project based on the fact that the developers who were building the project had raised the finished grade of the project by adding tons of fill on top of the natural ground, and homes built on the fill could violate the Height Restriction Law because their rooftops would be higher than 30 feet from the lower natural grade.

On December 22, 2004, as a result of the rescission, representatives of the developers of the Sandhills and Fairways projects (collectively, "subject projects") had a private meeting with Mayor Alan Arakawa (Mayor), the Planning Director, and numerous representatives from various county agencies. At this meeting, the developers expressed their concerns about the County's application of the post–1991 definition of "height" to the MLPD and the County's "rescission" of final subdivision approval. The developers expressed their belief that Ordinance 1924, which had constituted Phase 1 approval for the MLPD, authorized the application of the pre–1991 definition of height, and the developers had already expended "substantial funds in conjunction with the Sandhills project."

As a result of this meeting and various internal communications, the Mayor orally advised the developers that the County "would continue to adhere to [the pre–1991 definition] to interpret the height restriction since the Sandhills and the Fairways Projects had already received Phase I and Phase

II Project District Approvals prior to the 1991 enactment of the building height restriction amendment and were within the [MLPD]."

On May 31, 2005, the Mayor sent a letter to one of the developers confirming this oral agreement. The Mayor wrote that to resolve the conflict over the issue of developments using fill with regard to building projects, which were approved before the 1991 redefinition of height, "I made an administrative decision to allow the project to proceed with the building heights determined from the finished grade." The Mayor's letter went on to state, "Project District Phase III approval was granted based on this decision."

A copy of this letter was sent to the Planning Director on December 22, 2005, seemingly in response to the Planning Director's inquiry concerning the county's granting of Phase III approval for the Fairways project. By mid–2007, both the Sandhills and Fairways projects had received Phase III approval pursuant to the Mayor's decisions.

### C.

On July 18, 2007, in response to the grading and compacting of "tons of dirt" allegedly over thirty feet high and a retaining wall of equal size "loom[ing]" over their houses and blocking their view planes over a "pleasant green valley," Karen Goo, et al. (Homeowners), filed a complaint against the Mayor and the Planning Director (collectively, "County") alleging that the Mayor had unlawfully exempted the subject projects from the Height Restriction Law. The complaint also alleged tort claims against the County, defendants VP and PK (ML), KCOM Corp. and, eventually, New Sand Hills (collectively, "Developers") alleging.[1] Counts I and II sought declaratory and injunctive relief requiring the County to enforce the Height Restriction Law generally and specifically to projects in the MLPD.

On November 16, 2007, Homeowners filed a motion for partial summary judgment (MPSJ). Homeowners' MPSJ requested an order that the County enforce the Height Restriction Law definition of "height" on the subject projects, and Developers be required to remove any improvements made in violation of the CZO's post–1991 definition.

On December 28, 2007, Developers filed a motion to dismiss Homeowners' complaint, which the County joined. Developers argued, inter alia, that the complaint failed to join indispensable parties, specifically "each and every lot owner within the [MLPD] permitted after the 1991 Amendment[.]" On February 25, 2008, the circuit court partially granted Developers' motion to the extent that the circuit court ordered Homeowners to provide notice of the lawsuit to "all lot or real property owners within the [MLPD] whose rights would be affected should [the circuit court] grant the relief sought by [Homeowners] in Counts I and II." The order required that Homeowners personally serve all of these "indispensable parties."

On May 21, 2008, the attorney for Homeowners submitted a declaration confirming that all potential parties-in-interest had been notified in accordance with the circuit court's order. A total of 337 parties acknowledged receipt of notice, while 523 parties received the notice, as indicated by certified mail receipts, but had not responded.

A hearing was held on Homeowners' MPSJ on December 9, 2009. On December 31, 2008, the circuit court issued its Findings of Fact, Conclusions of Law, and Order Granting Plaintiffs' Motion for Partial Summary Judgment (Order Granting Partial Summary Judgment), granting Homeowners' November 16, 2007 MPSJ. In accordance with its Order Granting Partial Summary Judgment, the Court ruled that the Height Restriction Law's definition of height applied

---

1. In addition to Counts I and II, Homeowners alleged various claims for, inter alia, negligence, nuisance, and intentional and/or negligent infliction of emotional distress against Developers. On April 10, 2008, over the objection of Homeowners, the circuit court bifurcated Counts I and II from the other claims, and this case proceeded on Counts I and II alone. The circuit court also

ruled that only the County would remain a defendant on Counts I and II. On May 13, 2008, Developers filed a motion to intervene, which was granted on June 4, 2008. Homeowners amended their complaint four times. Defendant New Sand Hills was added as a defendant in an amended complaint.

to all projects in the MLPD and enjoined the county from issuing any building permits to projects that violated the post–1991 definition. The order stated that declaratory relief would apply to the MLPD as a whole; however, the circuit court limited the scope of the injunctive relief to the Sandhills and Fairways projects, "so that the remedy is no more burdensome to Defendant County of Maui than necessary to provide complete relief to plaintiffs." The order decreed:

1. The Maui Lani Project District, as a whole, is subject to the residential height restriction as determined in 1991 and codified at Maui County Code § 19.04.040,[2] which states that building height "means the vertical distance measured from a point on top of a structure to a corresponding point directly below on the natural or finish grade, whichever is lower."

2. Defendant, County of Maui, is enjoined from taking any action which conflicts with the Court's determination of the applicable height restriction relative to the Sandhills project and the Fairways project including, but not limited to, the issuance of building permits the result of which would be inconsistent with Maui County Code § 19.04.04.

3. This Order shall remain in effect until further order of the Court.

## D.

On January 23, 2009, Homeowners made a motion for attorneys' fees pursuant to the private attorney general doctrine. Homeowners set forth the three prongs of the private attorney general doctrine: "(1) the strength or societal importance of the public policy vindicated by the litigation, (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff, [and] (3) the number of people standing to benefit from the decision."[3]

Homeowners argued their lawsuit forced the county to enforce important zoning laws, was necessary because the Mayor had acted illegally, a significant burden had fallen upon Homeowners because the County and Developers were actively opposing Homeowners, and all the people of Maui stood to benefit from the court's ruling.

On February 24, 2009, the circuit court held a hearing on the motion for attorneys' fees. The circuit court concluded that Homeowners met the first two prongs of the private attorney general doctrine. However, the circuit court found Homeowners did not meet the third prong because of the limited immediate applicability of the Height Restriction Law to only the subject projects within the MLPD and the fact that the offending fill blocking Homeowners' views would not be removed, thus making it unclear how many people would benefit from the circuit court's decision.[4]

On March 16, 2009, this court decided *Sierra Club v. Department of Transportation of State of Hawai'i*, 120 Hawai'i 181, 202 P.2d 1226 (2009) (*Superferry II*). On March 31, 2009, Homeowners filed a motion for reconsideration of the denial of their motion for attorneys' fees. Homeowners argued they met the third prong because their lawsuit benefited the entire population of Maui by promoting the rule of law on Maui through enforcement of the zoning code, emphasized the importance of public participation in the zoning process, and reduced the likelihood of "future developers claiming an exemption from the zoning law after holding a closed-door meeting with the mayor."

On April 23, 2009, the circuit court held a hearing on Homeowners' motion for reconsideration. The circuit court found that, based on its reading of *Superferry II*, Homeowners failed to satisfy the first prong of the private attorney general doctrine as well as the third prong.

---

2. MCC § 19.04.040 refers to the CZO's "definitions" section.

3. In light of our disposition of this case, we do not expand upon the arguments and court rulings concerning the first two prongs of the private attorney general doctrine.

4. On April 3, 2009, the circuit court filed its order denying Homeowners' January 23, 2009, motion for attorneys' fees.

Concerning the number of people benefitted in relation to the third prong, the circuit court noted Homeowners' complaint concerned only two subdivisions and not a statute of statewide application. The circuit court noted further that the entire case was limited only to several homeowners living adjacent to the projects involved. While recognizing that its ruling had county-wide implications, the circuit court observed that more people could be harmed by its decision than benefitted because the owners of property in the MLPD would not be able to build homes.

On June 3, 2009, the circuit court entered its order denying Homeowners' motion for reconsideration.

The County and Developers appealed the circuit court's final judgments.[5] Homeowners appealed the circuit court's denial of attorneys' fees.

## II.   Appellate Proceedings
### A.

On March 19, 2010, Homeowners filed their Opening Brief.[6] Homeowners raised a single point of error:

> Whether the trial court erred in denying Homeowners' request for attorneys' fees against the County under the private attorney general doctrine.

Homeowners argued in their Opening Brief that their lawsuit satisfied the third prong of the private attorney general doctrine because it benefitted the entire population of Maui and any persons who may purchase property on Maui in the future, and denying Homeowners' request for attorneys' fees would discourage future lawsuits such as theirs.

On August 28, 2011, after the briefing was submitted to the ICA, the Council adopted a bill that became Ordinance 3848. *Karen Goo, et al., v. Mayor Alan Arakawa, et al.*, No. SCWC–30142, 130 Hawai'i 350, 2013 WL 5289010, at *3 (App. Oct. 7, 2013) (mem.).

Ordinance 3848 amended the CZO's definition of height to the following: "[f]or structures within project districts that received phase II approval prior to September 4, 1991, finish grade shall be used to determine height." *Goo*, 2013 WL 5289010, at *3. On June 12, 2013, the ICA ordered the parties to file supplemental briefs on the question of "whether, in light of Ordinance 3848, any of the issues raised on appeal are moot." *Id.* at *4. The ICA's supplemental briefing order did not require the parties to brief the issue of vacatur.

On June 28, 2013, Homeowners filed their supplemental brief. Homeowners argued that all of the issues raised by the County and Developers were moot because Ordinance 3848 granted the County and Developers the exact relief they requested, namely allowing the subject projects to measure building height from finished grade.

Homeowners contended, however, that their appeal concerning attorneys' fees was not moot. Homeowners argued that it would be absurd to allow the County's passage of a law making previously illegal conduct legal to defeat a claim for attorneys' fees under the private attorney general doctrine with regard to a lawsuit that forced the change in the law.

On July 2, 2013, both the County and Developers submitted their supplemental briefs. The County argued that its appeal and Homeowners' appeals were moot. The County contended, however, that Homeowners' appeal concerning attorneys' fees was also moot.

The County argued further that the ICA should vacate the circuit court's decision because "merely dismissing the appeal due to mootness could result in the trial court's judgment imposing collateral estoppel." The County argued that it was not issuing building permits for the subject projects because of the circuit court's 2008 order. Therefore, the County requested that the order be va-

---

5.  The circuit court issued three final judgments in this case on January 12, 2009, April 3, 2009 and September 30, 2009.

6.  Neither the County nor the Developers sought a writ of certiorari from the ICA's decision in this case. Similarly Defendant Sandhills Estates Community Association also filed a cross-appeal, but did not seek review of the ICA decision.

cated so that building could proceed pursuant to Ordinance 3848.

Developers also contended in their memorandum that the case was not moot because the County was not issuing building permits.

### B.

The ICA issued its Memorandum Opinion on September 19, 2013. The ICA found that Ordinance 3848 settled the primary issue of whether the "pre–1991 definition of height or the more restrictive 1991 definition of height applies to the [subject projects] within the [MLPD]" and, thus, that issue was moot. *Goo*, 2013 WL 5289010, at *5–6.

The ICA stated that Developers' concerns "should be assuaged" by its decision to vacate the circuit court's order and judgments. *Id.* at *7 n. 9, *8.

The ICA's analysis with respect to the issue of vacatur was as follows:

> As recognized in *Aircall of Haw., Inc. v. Home Props., Inc.*, 6 Haw.App. 593, 733 P.2d 1231 (1987), "where appellate review has been frustrated due to mootness[,]" the circuit court's judgment, which is unreviewable because of mootness, could lead to issue preclusion. *Id.* at 595, 733 P.2d at 1232. In *Aircall of Haw.*, and subsequently, in *Exit Co. Ltd. P'ship v. Airlines Capital Corp.*, 7 Haw.App. 363, 766 P.2d 129 (1988), this court noted that such a result would be unfair and resolved the potential for issue preclusion where a case is rendered moot on appeal by adopting "the federal practice of having the appellate court vacate the judgment of the trial court and direct dismissal of the case." *Exit Co.*, 7 Haw.App. at 367, 766 P.2d at 131 (citation and internal quotation marks omitted). We likewise apply this resolution to the present case.

*Id.* at *8. Thus, because appellate review of the Height Restriction Law issue was frustrated based on mootness and the judgment had the potential to "lead to issue preclusion," the ICA vacated the circuit court's

December 31, 2008 Order Granting Partial Summary Judgment and final judgments[7] with respect to Counts I and II of Homeowners' complaint for Declaratory and Injunctive Relief. *Id.* at *8. The ICA remanded the case to the circuit court with orders to dismiss the action. *Id.*

The ICA found that Homeowners' appeal concerning attorneys' fees was not moot, but concluded that Homeowners failed to meet the first and third prongs of the private attorney general doctrine.[8] *Id.* at *9. On the third prong, the ICA found that the number of people benefitting from the circuit court's ruling was unclear, probably limited, and the three-prong test of the private attorney general doctrine was intended to constrain the doctrine's application to "exceptional circumstances." *Id.* Therefore, the ICA concluded that the circuit court did not abuse its discretion in denying Homeowners' motions for attorneys' fees, and affirmed the circuit court's April 3, 2009 order denying Homeowners' motion for attorneys' fees. *Id.* at *12.

On September 27, 2013, Homeowners filed a timely motion for reconsideration addressing the ICA's vacation of the circuit court's judgments and order, and attaching what they stated were meeting minutes created after the circuit court's judgment that showed Ordinance 3848 was only passed as part of a "global settlement." The ICA denied the motion.

### III. Application for Writ of Certiorari
#### A.

On October 25, 2013, Homeowners timely filed their application for writ of certiorari (Application) and present the following questions:

A. Whether the declaratory judgment obtained by Homeowners should be vacated and dismissed because the County's [sic] caused the mooting of the underlying controversy, or are Homeowners entitled to keep the record of their success as the

---

7. It appears the ICA did not vacate the circuit court's April 3, 2009 final judgment.

8. The ICA did not address the second prong because it found Homeowners failed to meet the first and third prongs. *Goo*, 2013 WL 5289010, at *10.

prevailing party and to guide government officials in the future regarding the challenged illegal actions?

B. Whether Homeowners are entitled to their attorney's fees against the County under the private attorney general doctrine because their suit vindicated important public interests and benefitted the public broadly by compelling the County to faithfully and equally enforce its zoning laws, instead of exempting favored persons from the law's reach?

Homeowners argue the ICA erred in vacating the circuit court's "declaratory judgment." Homeowners agree the appeals of the County and Developers were moot, but contend that if a party to a suit causes the mootness, that party's actions preclude the equitable remedy of vacatur. Citing to "Minutes of Maui County Council Planning Committee," Homeowners maintain that the County passed Ordinance 3848 as part of a "global settlement" of various lawsuits concerning the post–1991 definition of height and its effects on the subject projects. Homeowners also quote "a County attorney" testifying before the Council recommending the passage of Ordinance 3848 so as to correct the decision of the circuit court in this case.[9]

Thus, Homeowners, relying on *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18, 25, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994), argue that vacatur was inappropriate in this case because the mootness of the primary issue did not occur through happenstance but rather as the result of a concerted effort by the County and Developers to circumvent the circuit court's decision. Homeowners acknowledge that the injunction can be vacated, but argue the declaratory judgment should be kept in place as recognition of Homeowners' challenge to the Mayor's illegal conduct and their vindication of the important public policy of equal enforcement of zoning laws.

Homeowners also contend the ICA erred in affirming the circuit court's denial of attorneys' fees, arguing that denying their request for attorneys' fees would have a chilling effect on lawsuits filed by "ordinary" people seeking to enforce zoning laws. Homeowners maintain their personal interest in the outcome did not preclude an award of fees under the private attorney general doctrine. They argue further that the hundreds of notices the circuit court ordered Homeowners to mail demonstrated that the case had a widespread effect.

### B.

The County, in its Response to Homeowners' Application, argues that the vacatur by the ICA was proper. The County reasons that the Maui County Council is an independent branch of government from the County executive branch defendants and thus, regardless of lobbying by the executive branch, the County "is in a position akin to a party who finds its case mooted on appeal by 'happenstance,' rather than by events within its control."

The County maintains that the ICA properly found that the circuit court did not abuse its discretion in denying Homeowners attorneys' fees.

Developers in their Response to Homeowners' Application also argue that vacatur was proper because the underlying appeal was moot. In addition to arguments made by the County, Developers maintain that Homeowners' citations to the Maui County Council Planning Committee Reports and Minutes were inappropriate because they were not accompanied with citations to the Record on Appeal. Developers also contend that Homeowners were judicially estopped from arguing against the vacatur of the circuit court's declaratory judgment because Homeowners argued in their supplemental briefing on mootness that all issues in the case were moot, and they did not ask the ICA to affirm the circuit court's declaratory judgment.

Further, Developers assert that lot owners who cannot build on their lots may sue Developers and rely on the circuit court's declaratory judgment "for the proposition that the law at the time the lot owners purchased

---

9. These documents were apparently created after Council meetings in 2011 and 2009, respectively.

The circuit court rendered its ruling against the County and Developers in 2008.

their lots prohibited or limited construction on lots with fill." This would result in Developers being unfairly "forced to expend time, effort, and expense defending against the legal claims that would likely arise if the declaratory judgment is not vacated."

### C.

Homeowners replied to both the County's and Developers' responses. Homeowners contend that because the County was defending an illegal action by the Mayor, rather than a preexisting law, the Council's passing of an ordinance retroactively legalizing the Mayor's conduct amounted to a voluntary action by the County to moot this case. Homeowners argue that vacatur is an equitable remedy, and the action by the Council to legalize the Mayor's illegal conduct did not entitle the County to such a remedy.

In reply to Developers, Homeowners argue that they brought the issue of vacatur to the attention of the ICA in their motion for reconsideration. Homeowners maintain that the ICA did not order them to brief the issue of vacatur, and the first chance Homeowners had to raise the issue was in their motion for reconsideration. Homeowners contend that the Meeting Minutes they referenced could not be part of the Record on Appeal as the minutes were created after the Record on Appeal was created. Finally, Homeowners conclude that vacatur of the declaratory judgment was a "last slap in the faces of [Homeowners] ... who sought judicial recognition that the mayor's actions were contrary to law[.]" Thus, Homeowners request that this court "remand the matter to the trial court for further proceedings regarding the effect of [Ordinance 3848] on the injunction but preserving the Declaratory Judgment[.]"

### IV. Discussion

### A. Vacatur

### 1.

In *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18, 22, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994), the Supreme Court held that in cases where "a judgment has become moot while awaiting review, this Court may not consider its merits, but may make such disposition of the whole case as justice may require." The Court explained that vacatur is an "extraordinary remedy." *Id.* at 26, 115 S.Ct. 386 (brackets omitted).

In *Bancorp*, at issue was whether vacatur should be granted where mootness results from a settlement agreement between the parties. *Id.* at 20, 115 S.Ct. 386. In resolving this question, the Court first noted that in the prior leading case on vacatur, *United States v. Munsingwear, Inc.*, 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950), the Court had stated that vacatur "clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance." *Bancorp*, 513 U.S. at 22–23, 115 S.Ct. 386 (quoting 340 U.S. at 40, 71 S.Ct. 104). The parties in *Bancorp* had agreed that pursuant to *Munsingwear*, vacatur must be ordered for judgments rendered moot "through happenstance"; that is, "where a controversy presented for review has become moot due to circumstances unattributable to any of the parties." *Id.* at 23, 115 S.Ct. 386 (quotation marks omitted). However, the Court disagreed, characterizing the reference to "happenstance" in *Munsingwear* as "dictum." *Id.* at 23, 115 S.Ct. 386.

In any event, the *Bancorp* Court held that the "principles that have always been implicit in our treatment of moot cases counsel against extending *Munsingwear* to settlement," as the Court had always "disposed of moot cases in the manner most consonant to justice in view of the nature and character of the conditions which have caused the case to become moot." *Id.* at 24, 115 S.Ct. 386 (quotation marks and ellipses omitted). "The reference to 'happenstance' in *Munsingwear*" was merely an "allusion to this equitable tradition of vacatur," given that "[a] party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment." *Id.* at 25, 115 S.Ct. 386.

Thus, "[t]he principal condition to which [the Court] looked [was] whether the party seeking relief from the judgment below caused the mootness by voluntary action."

*Id.* at 24, 115 S.Ct. 386. The Court emphasized that the settlement of a case is not a result of "happenstance," but a voluntary act of the parties. *Id.* at 23–27, 115 S.Ct. 386. The Court held that "[w]here mootness results from settlement ... the losing party has voluntarily forfeited his legal remedy by the ordinary processes of appeal or certiorari, thereby surrendering his claim to the equitable remedy of vacatur." *Id.* at 25, 115 S.Ct. 386.

Additionally, the Court explained that its holding "must also take account of the public interest," which "requires" that the "demands of orderly procedure [of appeal] ... be honored when they can." *Id.* at 26–27, 115 S.Ct. 386. The Court declared, "[j]udicial precedents are presumptively correct and valuable to the legal community as a whole. They are not merely the property of private litigants and should stand unless a court concludes that the public interest would be served by a vacatur." *Id.* at 26, 115 S.Ct. 386 (quotation marks and citation omitted). Because the primary route for parties to seek relief from judgments was through appeal and certiorari, "[t]o allow a party who steps off the statutory path to employ the secondary remedy of vacatur as a refined form of collateral attack on the judgment would-quite apart from any considerations of fairness to the parties-disturb the orderly operation of the federal judicial system." *Id.* at 27, 115 S.Ct. 386.

The *Bancorp* Court thus held that where a case has become moot because the losing party voluntarily abandoned its right of review, e.g., through settlement, vacatur is not justified, although "exceptional circumstances may conceivably counsel in favor of such a course." *Id.* at 29, 115 S.Ct. 386. Moreover, the Court held that, in all situations, the party requesting relief from the status quo had the burden of proving "equitable entitlement to the extraordinary remedy of vacatur." *Id.* at 26, 115 S.Ct. 386. Finally, the Court determined that "even in the absence of, or before considering the existence of, extraordinary circumstances, a court of ap-

peals presented with a request for vacatur of a district-court judgment may remand the case with instructions that the district court consider the request, which it may do pursuant to Federal Rule of Civil Procedure 60(b)." *Id.* at 29, 115 S.Ct. 386.

Thus, *Bancorp* established a presumption against vacatur in situations where the party requesting vacatur voluntarily caused the case to become moot. The case also overruled what had become a federal practice under *Munsingwear*, of automatically vacating judgments that had become moot on appeal so as to avoid issue preclusion attaching to a judgment that could not be reviewed on appeal. 340 U.S. at 39–40, 71 S.Ct. 104. *See also Valero Terrestrial Corp. v. Paige*, 211 F.3d 112, 120 (4th Cir.2000) (in the forty-four years between the Court's decision in *Munsingwear* and its decision in *Bancorp*, the prevailing practice among district courts was to follow the appellate court practice of automatically vacating moot judgments, pursuant to *Munsingwear* ).

This practice had led to a situation where "repeat litigants," such as insurance companies, were settling cases after losing at the trial level against "one-time litigants," such as policy-holders, but only on the condition that judgments adverse to the interests of the repeat litigant were vacated. Eugene R. Anderson, et. al., *Out of the Frying Pan and into the Fire: The Emergence of Depublication in the Wake of Vacatur*, 4 J. App. Prac. & Process 475, 476 (2002). Thus, "[t]hrough vacatur, insurance companies [could] eradicate or reduce the number of pro-policy holder decisions and then argue that the weight of authority [was] in their favor." [10]

■ *Bancorp* responded to this practice by holding that appellate courts could no longer vacate lower court judgments based solely on a settlement agreement, which represents a voluntary abandonment of the right to appellate review, absent "exceptional" or "extraordinary" circumstances. While *Bancorp* preserved *Munsingwear*'s dictum that

---

**10.** *Cf. Am. Games, Inc. v. Trade Prods., Inc.*, 142 F.3d 1164, 1170 (9th Cir.1998) (finding that in cases of merger, the courts should evaluate the "economics and incentives of the transaction to smoke out" whether the merging parties are manipulating the common law through a "buy and bury" strategy of vacating adverse judgments through merger).

mootness resulting from "happenstance" provides sufficient reason to vacate, 513 U.S. at 25 n. 3, 115 S.Ct. 386, the Court clearly emphasized the need to consider the public interest in preserving judicial precedents and "the orderly operation of the federal judicial system" when granting equitable relief such as vacatur. 513 U.S. at 26–27, 115 S.Ct. 386. Furthermore, as noted, *Bancorp* explicitly states that, even before considering the existence or absence of "extraordinary circumstances," an appellate court presented with a request for vacatur may remand to the trial court pursuant to the federal rules. *Id.* at 29, 115 S.Ct. 386. Thus, *Bancorp* clearly allows an appellate court to weigh the equities of vacatur or to simply remand to the trial court to determine whether a judgment should be vacated based upon consideration of the equities in the case.

The Ninth Circuit's decision in *American Games, Inc. v. Trade Products, Inc.*, 142 F.3d 1164 (9th Cir.1998), demonstrates the value in an appellate court having the option of remanding in situations where a case has become moot, even by happenstance. In that case, a district court judgment resolving a controversy between two parties was mooted while the case was on appeal to the Ninth Circuit, due to an "asset sale that effectively merged the two companies." *Id.* at 1165–66. The parties then "requested dismissal of the appeal and vacation of the district court judgment." *Id.* at 1166. Rather than weighing the equities of vacatur, the Ninth Circuit dismissed the appeal and remanded the case to the district court "for the purpose of considering the motion for vacatur." *Id.*

On remand, the district court allowed a third-party corporation that had an interest in the preclusionary value of the mooted judgment to intervene and argue against vacatur. *Id.* at 1166–67. The defendant-corporation (the result of the merger), argued that the judgment should be vacated pursuant to *Munsingwear* because the merger was "happenstance." *Id.* at 1166. The district court decided that the case "[fell] somewhere between [*Bancorp*] (mootness by settlement) and [*Munsingwear*] (mootness by happenstance)." *Id.* However, after balancing the

equities, the district court found that the "merger was motivated by legitimate business reasons only incidental to the mooted case, and not for the purpose of settling the case." *Id.* The district court thus issued the vacatur order. *Id.* The Ninth Circuit affirmed the vacatur order, holding that due to the "fact-intensive" nature of the "happenstance" inquiry, the district court could conduct an equitable balancing test instead of an "extraordinary circumstances" test. *Id.* at 1169–70.

*Am. Games* thus exemplifies how factually complex a "happenstance" vs. "voluntary" analysis can be. *Am. Games* also demonstrates how, through the "orderly operation of the federal judicial system," *Bancorp*, 513 U.S. at 27, 115 S.Ct. 386, appellate courts can utilize remand to trial courts to develop a fuller record before deciding the issue of vacatur.

The concurrence in *Keahole Defense Coalition, Inc. v. Board of Land & Natural Resources*, 110 Hawai'i 419, 437, 134 P.3d 585, 603 (2006) (Del Rosario, Circuit Judge, concurring),[11] also recognized that the *Bancorp* "exceptional circumstances" test applied only to <u>appellate</u> court vacatur. *Id.* Citing to *Am. Games*, the concurrence explained that trial courts, on the other hand, could vacate their own judgments based on an equitable balancing test, even in the presence of voluntary action by the party requesting vacatur. *Id.* (citing 142 F.3d at 1169–70).

In this case, the ICA held that vacatur was proper because, " 'where appellate review has been frustrated due to mootness[,]' the circuit court's judgment, which is unreviewable because of mootness, could lead to issue preclusion." *Goo*, 2013 WL 5289010, at *8 (citing *Aircall of Haw., Inc. v. Home Props., Inc.*, 6 Haw.App. 593, 733 P.2d 1231 (1987)). The ICA concluded, based on *Exit Co. Ltd. Partnership v. Airlines Capital Corp.*, 7 Haw.App. 363, 367, 766 P.2d 129, 131 (1988), which in turn cited to *Aircall*, that such a result would be unfair to defendants and resolved this unfairness "by adopting 'the federal practice of having the appellate court vacate the judgment of the trial court and

**11.** Justice Acoba wrote the majority opinion and      joined the concurring opinion.

direct dismissal of the case.' " *Goo*, 2013 WL 5289010, at *8 (quoting *Exit Co.*, 7 Haw.App. at 367, 766 P.2d at 131).

*Aircall*, however, relied on *Munsingwear* to justify the "practice" of appellate courts vacating moot trial court judgments solely to avoid issue preclusion. 6 Haw.App. at 595, 733 P.2d at 1233 ("Vacation of the [circuit court's order] and remand of the case to the circuit court with direction to dismiss the action will prevent the ... Order, which is 'unreviewable because of mootness, from spawning any legal consequences.' [*Munsingwear* ], 340 U.S. at 41 [71 S.Ct. 104.]"). However, as set forth above, *Bancorp* essentially abolished this federal practice.

In its place, *Bancorp* established the "extraordinary circumstances" test for appellate court vacatur of lower court judgments rendered moot by the voluntary actions of the parties, and directed federal appellate courts to "take account of the public interest" before vacating cases mooted by "happenstance." The procedural history in *Am. Games* demonstrated further that even cases apparently mooted on appeal by "happenstance" may require "fact-intensive" inquiries that are best left to trial courts to resolve.

Here, the ICA did not evaluate whether the Council's passage of the ordinance was "happenstance," an action not attributable to the voluntary action of the parties, which would have justified vacatur under *Munsingwear* as affirmed by *Bancorp*. *Munsingwear*, 340 U.S. at 39–40, 71 S.Ct. 104; *Bancorp*, 513 U.S. at 25 n. 3, 115 S.Ct. 386. The ICA did not explain how the defendants carried their burden of establishing their "equitable entitlement to the extraordinary remedy of vacatur." *Bancorp*, 513 U.S. at 26, 115 S.Ct. 386. Finally, the ICA did not "take account" of how vacatur would serve the public interest. *Id.* at 26–27, 115 S.Ct. 386.

Homeowners also maintain their motion for reconsideration was the first opportunity they had to address the question of vacatur,[12] and Ordinance 3848 was passed only as part of a "global settlement." Homeowners also quoted what was contended to be "Minutes of Maui County Council Planning Committee" purporting to show that Ordinance 3848 was part of this settlement, but the Minutes were not in the record because the case became moot after the record was developed. Although the record would not be able to reflect the existence of such a settlement because the case became moot due to actions taken by the Council after the appeal was taken, if a settlement agreement had been demonstrated the ICA would have had to find "extraordinary circumstances" to justify vacatur under *Bancorp*. 513 U.S. at 29, 115 S.Ct. 386.

Thus, the ICA did not properly analyze the vacatur issue.

### 2.

■ The County and Homeowners agree that the circuit court's judgment was rendered moot as a result of the Council's enactment of Ordinance 3848. They also agree that the injunction can be vacated. Homeowners argue, however, that the Council's passage of Ordinance 3848 was attributable to the County because the County lobbied for its passage, Ordinance 3848 was part of a "global settlement," and the County was defending an illegal action by the Mayor as opposed to an existing law. The County counters that actions of the legislative branch were not attributable to the executive branch, and thus the County "is in a position akin to a party who finds its case mooted on appeal by 'happenstance,' rather than by events within its control."

Regardless of which party is correct, this is precisely the type of equity-balancing, fact-intensive situation that is best left to the circuit court to evaluate. Because this case became moot while on appeal, *Goo*, 2013 WL 5289010, at *3, the parties did not have an opportunity to adduce evidence, present memoranda, or make arguments to the circuit court judge, who would have been in the

---

12. The ICA's supplemental briefing order did not require the parties to brief the issue of vacatur. Additionally, Homeowners filed their supplemental brief before the County and Developers, and thus did not have an opportunity to respond to the defendants' requests for vacatur in their briefs. Thus, Developers' argument that Homeowners waived their right to argue against vacatur is without merit.

best position to make factual determinations as to the cause of the mootness and to balance the equities of the case. The record on the vacatur issue is not only incomplete, it is virtually non-existent, as all, or virtually all, of the actions resulting in the case becoming moot occurred after the appeals were filed.

A remand to the lower court is commonly invoked by appellate courts when a case becomes moot while awaiting a decision on appeal. *See Am. Games,* 142 F.3d at 1168 (describing the Ninth Circuit's "established procedure of remanding so the district court can decide whether to vacate its judgment in light of the consequences and attendant hardships of dismissal or refusal to dismiss and the competing values of finality of judgment and right to relitigation of unreviewed disputes" (quotation marks omitted)).

Given the "fact-intensive" nature of the inquiry into whether the party seeking vacatur caused the case to become moot, a trial court is better equipped than an appellate court operating at a distance to fashion equitable relief. *See id.* at 1170 ("Given the fact-intensive nature of the inquiry required, it seems appropriate that a district court should enjoy greater equitable discretion when reviewing its own judgments than do appellate courts operating at a distance."). *See also Rio Grande Silvery Minnow v. Bureau of Reclamation,* 601 F.3d 1096, 1139 (10th Cir.2010) (Henry, J., dissenting) ("the district court is better equipped than we are to fashion equitable relief, and we afford it considerable discretion in doing so"). Remand to the lower court also better protects the "orderly operation of the judicial system" by leaving fact-finding powers with the trial courts and review of the trial courts' discretion to the appellate courts. *Bancorp,* 513 U.S. at 27, 115 S.Ct. 386.

Moreover, unlike an appellate court that is more likely to be in the position of rendering an "all or nothing" determination (vacating or not vacating), a lower court may modify a judgment to address the interests of both parties.

■ Thus, the better rule to apply is that, when a case becomes moot on appeal and the trial court has not had an opportunity to evaluate a motion for vacatur, the appellate court, in the absence of exceptional circumstances, should remand the case to the trial court to give the court the first opportunity to evaluate the cause of the mootness based on a complete record.

*Bancorp*'s preservation of *Munsingwear*'s "happenstance" analysis is, in practice, impractical. As shown by *Am. Games,* even the analysis of "happenstance" is "fact-intensive." 142 F.3d at 1170. Additionally, if a case became moot while on appeal, there would likely be no record on which an appellate court could properly analyze whether the "controversy ... has become moot due to circumstances unattributable to the parties." *Bancorp,* 513 U.S. at 23, 115 S.Ct. 386.

Enabling the trial court to evaluate the issue first, and perhaps reach a middle ground, or allow agreement of the parties, would also be consistent with the policy of preserving judgments. *Bancorp,* 513 U.S. at 26–27, 115 S.Ct. 386 (judicial precedents are valuable to the legal community as a whole). A remand to the trial court also furthers the interests of judicial economy, as it avoids a situation in which an appellate court analyzes a motion for vacatur, denies it, and then a party below files an HRCP Rule 60(b) motion for vacatur in the circuit court.[13] *Am. Games,* 142 F.3d at 1169 ("[A trial court] is not precluded by [an appellate court's denial of a request for vacatur] from vacating its own judgment after an independent review of the equities, and we therefore follow our established practice of remanding the case to the [trial court] for such a determination." (quoting *Cammermeyer v. Perry,* 97 F.3d 1235, 1239 (9th Cir.1996))).

---

**13.** HRCP Rule 60(b) provides:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons:

. . . .

(5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

Accordingly, when a case is mooted while on appeal, the appellate court should, absent exceptional circumstances, remand the case to the trial court for a consideration of the vacatur issue.

### 3.

The ICA erred by vacating the circuit court's December 31, 2008 Order Granting Partial Summary Judgment and judgments and remanding to the court for dismissal given that the more equitable rule for cases that have been rendered moot on appeal is for appellate courts, in the absence of extraordinary circumstances, to remand to the trial court to evaluate the issue of vacatur based upon a developed record. The case should have therefore been remanded to the circuit court to allow that court an opportunity to consider an HRCP Rule 60(b) motion for vacatur. The circuit court may then make factual findings, balance the equities of the case, and exercise its discretion as to whether its own judgment should be vacated in whole or in part. *Am. Games,* 142 F.3d at 1168, 1170. *See also Keahole,* 110 Hawai'i at 437, 134 P.3d at 603 (Del Rosario, Circuit Judge, concurring); *Bancorp,* 513 U.S. at 29, 115 S.Ct. 386.

### B. Private Attorney General Doctrine

■ "[N]ormally, pursuant to the 'American Rule,' each party is responsible for paying his or her litigation expenses." *Superferry II,* 120 Hawai'i at 218, 202 P.3d at 1263 (quotation marks, brackets and citation omitted). This general rule is subject to several exceptions, including the private attorney general doctrine. *Id.*

■ The private attorney general doctrine "is an equitable rule that allows courts in their discretion to award [attorneys'] fees to plaintiffs who have vindicated important public rights." *Id.* (quoting *Maui Tomorrow v. State,* 110 Hawai'i 234, 244, 131 P.3d 517, 527 (2006)). Courts applying this doctrine consider three basic factors: "(1) the strength or societal importance of the public policy vindicated by the litigation, (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff, (3) the number of people standing to

benefit from the decision." *Superferry II,* 120 Hawai'i at 218, 202 P.3d at 1263. All three prongs must be satisfied by the party seeking attorneys' fees. *See Waiahole II,* 96 Hawai'i at 31, 25 P.3d at 806 (although the parties satisfied the first and third prongs, failure to satisfy the second prong meant the private attorney general doctrine did not apply). *Maui Tomorrow,* 110 Hawai'i at 245, 131 P.3d at 528 (the private attorney general doctrine did not apply because the plaintiffs' case failed to satisfy the second prong of the private attorney general doctrine).

The circuit court in this case denied attorneys' fees to Homeowners, holding · that Homeowners failed to satisfy the first and third factors of the doctrine. The ICA agreed with the circuit court's analysis and affirmed the court's order denying Homeowners' motion for attorneys' fees. *Goo,* 2013 WL 5289010, at *8–12.

■ This court reviews circuit court awards of attorneys' fees under the abuse of discretion standard. *Honolulu Const. & Draying Co., Ltd. v. State, Dep't of Land & Natural Res. (Irwin Park II ),* 130 Hawai'i 306, 313, 310 P.3d 301, 308 (2013). However, "we review de novo whether the trial court disregarded rules or principles of law that arise in deciding whether or not a party satisfies the three factors of the private attorney general doctrine." *Id.*

In *Waiahole II,* the court held that the third prong of the private attorney general doctrine appeared to be met, as the case "involved constitutional rights of profound significance, and all of the citizens of the state, present and future, stood to benefit from the decision." 96 Hawai'i at 31, 25 P.3d at 806. The court found the impact of the decision similar to cases in other jurisdictions that applied the doctrine to award fees in situations involving the public trust doctrine. *Id.*

In *Superferry II,* the third criterion was satisfied because the underlying action resulted in "generally applicable law that established procedural standing in environmental law and clarified the need to address secondary impacts in environmental review[.]" 120 Hawai'i at 221, 202 P.3d at

1266. Thus, the decision would "benefit large numbers of people over long periods of time." *Id.* The court in the underlying case had expressly stated that "[a]ll parties involved and society as a whole' would have benefitted had the public been allowed to participate in the review process of the Superferry project, as was envisioned by the legislature when it enacted the Hawai'i Environmental Policy Act." *Id.* (quoting *Sierra Club I*, 115 Hawai'i at 343, 167 P.3d at 336).

Similarly in *Kaleikini v. Yoshioka*, the third prong was satisfied because the court's opinion "established 'generally applicable law' regarding standing to enforce historic preservation laws" and ensure that such laws would be enforced as written, "for the public good" and "in the public interest[.]" 129 Hawai'i 454, 466, 304 P.3d 252, 264 (2013). The court in *Nelson v. Hawaiian Homes Commission* also found the third prong satisfied where the underlying decision allowed the Department of Hawaiian Home Lands to shift funding from administrative expenses to operating expenses, thereby "provid[ing] a benefit to the Hawaiian Home Lands trust, impacting at least the tens of thousands of known beneficiaries on the waiting list, and ultimately benefitting the State as a whole, because stewardship of Hawaiian Home Lands was an obligation taken on by the State as a condition for admission into the union." 130 Hawai'i 162, 167–68, 307 P.3d 142, 147–48 (2013).

In *Irwin Park II*, the court considered the application of the third prong in "a situation where the public policy involves a discrete property or historic site open to the general public." 130 Hawai'i at 317–18, 310 P.3d at 312–13. The court explained that the underlying decision, which denied a petition to expunge a deed restriction requiring a historic site to be preserved as a public park, resulted in "benefits [that] would clearly accrue to residents and tourists who visit the Aloha Tower area through the continued preservation of Irwin Park." *Id.* at 318, 310 P.3d at 313.

The court recognized that the case "involved a discrete determination, rather than a direct challenge to a law or policy." *Id.* However, although the "litigation concerned a specific property, ... the result vindicated the dedication of public parks and historic sites across the state." *Id.* The court noted that the litigation prevented the state agency from "altering a historic site and acting in contravention" of applicable laws and the original grantor's intent in dedicating the property to be used as a public park. *Id.* at 318–19, 310 P.3d at 313–14. Thus, the case had "general precedential value for enforcing governmental adherence to the dedication of private land for public parks and as historic sites, and for the enforcement of the government's commitments to the preservation of such parks and historic sites." *Id.* at 319, 310 P.3d at 314.

This case in contrast did not involve the enforcement of a law of general state-wide applicability, did not benefit a substantial number of people on a scale comparable to decisions such as *Superferry II* or *Waiahole II*, and lacks general precedential value.

The circuit court's order in this case established that the MLPD as a whole was subject to the Height Restriction Law. The circuit court enjoined the County from taking any action that would conflict with the court's determination of the applicable height restrictions, as applied to the MLPD. Thus, the direct impact of the court's order was limited to the MLPD subdivisions.

Even within the MLPD, as the circuit court recognized, it was "very unclear" how many people would actually benefit from the court's ruling that the Height Restriction Law applied. The court's ruling did not result in removing the improvements that blocked Homeowners' view, and did not benefit the other lot owners within the MLPD who were prevented from building homes on their property.

Finally, this case involved private property and lacks precedential value, given the subsequent enactment that modified the Height Restriction Law by establishing that the pre–1991 height definition governed project districts that received phase II approval prior to September 4, 1991.

Accordingly, this case does not satisfy the third prong of the private attorney general doctrine pertaining to the number of people

standing to benefit from the decision. Because we find that Homeowners' failed to satisfy the third prong of the private attorney general doctrine, we do not examine the first two prongs. *Waiahole II*, 96 Hawai'i at 31, 25 P.3d at 806; *Maui Tomorrow*, 110 Hawai'i at 245, 131 P.3d at 528. Thus, the ICA did not err in finding that the circuit court did not abuse its discretion in denying Homeowners' request for attorneys' fees.

## V. Conclusion

For the foregoing reasons, we vacate that portion of the ICA's judgment that vacated the circuit court's judgments and December 31, 2008 Order Granting Partial Summary Judgment. The case is remanded to the circuit court for further proceedings consistent with this opinion. We affirm that portion of the ICA's judgment that affirmed the circuit court's denial of Homeowners' request for attorneys' fees.