Electronically Filed
Supreme Court
SCWC-16-0000807
30-APR-2020
10:08 AM

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

HAWAIIUSA FEDERAL CREDIT UNION,
Respondent/Plaintiff-Appellee,

vs.

JONNAVEN JO MONALIM; MISTY MARIE MONALIM,
Petitioners/Defendants-Appellants,

and

ASSOCIATION OF APARTMENT OWNERS OF BEACH VILLAS AT KO OLINA,
by its Board of Directors; KO OLINA COMMUNITY ASSOCIATION, INC.,
a Hawai'i nonprofit corporation;
Respondents/Defendants-Appellees.

SCWC-16-0000807

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000807; CIV. NO. 10-1-1388)

APRIL 30, 2020

McKENNA, POLLACK, AND WILSON, JJ., WITH NAKAYAMA, J., CONCURRING
AND DISSENTING, WITH WHOM RECKTENWALD, C.J., JOINS

OPINION OF THE COURT BY POLLACK, J.

The law has long permitted a borrower, or mortgagor,

to pledge real property to a lender, or mortgagee, as security

for a loan. In the event of a default, the mortgagee may sell the property to generate funds that will go toward paying what is owed. In some instances, however, the proceeds of the sale are insufficient to pay what is due under the mortgage, and the mortgagee is entitled to a deficiency judgment holding the mortgagor liable for the remaining balance.

Such a deficiency occurred in this case. The mortgagors defaulted on the loans, the property was sold, and the foreclosure sale price was less than the amount due on the mortgage. Thereafter, the mortgagee waited over four years, without explanation, before attempting to collect a deficiency judgment. The mortgagors contend that this delay was unreasonable and prejudiced them because they had begun to rebuild their lives in the years since the sale, and the mortgagee should therefore be barred from now seeking a deficiency judgment by the doctrine of laches. They also argue that, because the circumstances of a foreclosure auction are likely to result in the sale of the property for less than its fair market value, the process by which Hawaiʻi courts calculate a deficiency judgment is unfair. They ask that we instead adopt the approach favored by a majority of other jurisdictions and the Restatement (Third) of Property, in which the greater of the fair market value as of the date of the foreclosure sale or the

sale price of the property is deducted from the money owed when calculating the deficiency.

On review, we hold that the mortgagors' challenge to the deficiency judgment is not barred by res judicata and that the circuit court erred by failing to rule on their laches defense. We also hold that, because the traditional approach can result in unjust enrichment and the majority rule protects all parties to the mortgage, the equities weigh in favor of adopting the method of calculating a deficiency judgment employed by a majority of other jurisdictions. However, our adoption of the majority rule is prospective in effect and applies only to foreclosure cases in which a deficiency judgment is entered after the date of this opinion.

## I.    FACTS AND PROCEDURAL HISTORY

### A. Background

In 2008, Jonnaven Jo Monalim and Misty Marie Monalim (the Monalims) received two loans from HawaiiUSA Federal Credit Union (HawaiiUSA) to purchase a property located in Kapolei, Hawaiʻi (the Property). The Property was a three bedroom, three bathroom unit of the Beach Villas at Ko Olina Condominium built in 2008. The first loan (Note 1) was for $911,200.00; the second loan (Note 2) was for $113,900.00. Each loan was secured by a mortgage on the Property to HawaiiUSA.

On June 24, 2010, HawaiiUSA filed a complaint in the Circuit Court of the First Circuit (circuit court) against the Monalims,[1] alleging that the Monalims had defaulted on the notes and seeking to foreclose on the mortgages. Thereafter, HawaiiUSA filed a motion for summary judgment, which the circuit court granted on August 29, 2011 (Foreclosure Order). The circuit court found that the Monalims owed $1,024,428.04 on Note 1 and $121,547.20 on Note 2 and that HawaiiUSA was entitled to foreclose upon the mortgages securing the notes. On the same day, the circuit court entered its judgment on the Foreclosure Order (Foreclosure Judgment).

In the Foreclosure Order, the circuit court appointed a commissioner to take possession of the Property and oversee its sale, subject to confirmation by the court. HawaiiUSA was allowed under the Foreclosure Order to request a deficiency judgment in the event that the proceeds recovered from the Property's auction were insufficient to cover the Monalims' outstanding debt on the notes:

> At the hearing for confirmation of sale, if it appears that the proceeds of the sale of the Mortgaged Property are insufficient to pay all amounts due and owing to [HawaiiUSA], [HawaiiUSA] may request a deficiency judgment in its favor and against the [Monalims] for the amount of the deficiency which shall be determined at the time of confirmation and have immediate execution thereafter.

---

[1] The Honorable Bert I. Ayabe presided.

The Monalims filed an appeal of the Foreclosure Order and Foreclosure Judgment to the Intermediate Court of Appeals (ICA) on September 28, 2011. The appeal was dismissed on September 20, 2012, for failure to submit an opening brief.

The Property was auctioned at public sale on October 24, 2011. Prior to the sale, the Property received a 2011 tax assessment from the City and County of Honolulu in which it was valued at $703,600.00. According to the commissioner's report, only three people attended the auction and sixteen bids were received. The last bid was for $760,000.00. In the report, the commissioner stated that $760,000.00 was a fair and reasonable bid price based on comparable sales and recommended that the court confirm the sale. HawaiiUSA filed a motion to confirm the sale and for deficiency judgment. After a hearing, the circuit court entered an order granting the motion on December 22, 2011.

The circuit court outlined the amounts outstanding and directed the commissioner to disburse the proceeds of the sale in order of priority.[2] The court further ordered

> that since the proceeds from the sale of the Mortgaged
> Property are insufficient to fully satisfy the amounts due
> to [HawaiiUSA], that a motion for deficiency judgment may

---

[2] The circuit court found that as of October 31, 2011, the Monalims owed $1,080,852.79 on Note 1, which included the principal balance, interest, accumulated late charges, and an escrow advance, and owed $127,821.36 on Note 2, which included the principal balance and interest, plus any accruing late charges or advances up to the date of escrow closing. The order granting confirmation of sale also included amounts for commissioner's and attorneys' fees and costs.

subsequently be filed by [HawaiiUSA] against [the Monalims], jointly and severally.

The record indicates that the circuit court--based on the Monalims' objection--ordered a further hearing on the matter of the deficiency judgment.  The judgment confirming the sale was also entered on December 22, 2011.

### B. HawaiiUSA's Motion for Deficiency Judgment

Over four years later, on January 12, 2016, HawaiiUSA filed a motion for deficiency judgment.  In its motion, HawaiiUSA requested $355,687.07 on Note 1 and $131,755.87 on Note 2, which it alleged remained outstanding as of December 30, 2011, the closing date of the sale.[3]  The amount outstanding on Note 1 was calculated by subtracting the net proceeds of the sale ($735,045.92) from the amount owed on Note 1 ($1,090,732.99).  Because the net proceeds were insufficient to pay the full amount owed on Note 1, no sale proceeds were applied to the outstanding balance on Note 2.

The Monalims filed a memorandum opposing HawaiiUSA's motion for deficiency judgment, contending that the motion was untimely because HawaiiUSA waited "for more than an unprecedented four [] years" to bring the motion and that

_____

[3]     HawaiiUSA requested the following additional sums: "continuing interest" on both notes from December 30, 2011, until "the date of entry of the deficiency judgment and statutory interest" thereafter on both notes; attorneys' fees and costs for the preparation of the motion for deficiency judgment; and attorneys' fees and costs related to the Monalims' previously dismissed ICA appeal.

HawaiiUSA was therefore barred by the doctrine of laches. According to the Monalims, HawaiiUSA was required by the Foreclosure Order to request the amount of any deficiency immediately following the sale of confirmation, "which it [] deliberately chose [] not to do." The Monalims averred that they could have filed for Chapter 7 Bankruptcy and suffered no deficiency judgment had HawaiiUSA filed its motion in 2011. Instead, the Monalims contended, "in reliance upon there being no deficiency judgment they [had] set out to rebuild their lives." They each started a business, began saving for their daughter's college tuition, and were only a few months from clearing the foreclosure from their credit reports, the Monalims stated in an appended declaration. HawaiiUSA's unexplained delay in filing its motion for deficiency judgment would "overwhelming[ly] prejudice" them, they argued.

The Monalims also challenged the method used for calculating the deficiency judgment and contended that an evidentiary hearing should be held to determine the fair market value of the Property at the time of the sale. According to the Monalims, Hawaiʻi courts currently calculate the amount of a deficiency judgment by "mathematically" subtracting the net proceeds of the sale from the mortgage debt without considering any evidence of a higher property valuation or any subsequent sales for higher prices. Hawaiʻi courts will set aside the

earlier auction price only if it is said to "shock the conscience of the Court," the Monalims related.  The Monalims contended that this "completely ignores reality and equity" because lenders have the ability to routinely "credit bid" for the property at the foreclosure auction, thereby scaring away competition.[4]  This enables a mortgagee to recover the property at less than fair market value and secure a windfall, the Monalims asserted.  The result, the Monalims argued, is that borrowers are penalized beyond what the foreclosing mortgagee actually lost.

The Monalims contended that this procedure for calculating deficiency judgments violates both procedural and substantive due process because mortgagees are constitutionally entitled to no more than payment in full.  The Monalims maintained that Hawaiʻi's method represents the minority view among states and that the circuit court should instead conduct a separate evidentiary hearing to determine the fair market value of the Property, which would be deducted from the mortgage debt

---

[4]     A credit bid allows a secured lender to bid up to the amount of debt owed to it in lieu of cash at sale.  Lambert v. Teisina, 131 Hawaiʻi 457, 459 n.5, 319 P.3d 376, 378 n.5 (2014) (per curiam) ("A 'credit bid' is a bid up to an amount equal to the unpaid principal and interest of a debt, together with costs, fees, and other expenses, without tendering cash.").

in lieu of the sale price if it is the greater of the two. (Citing Sostaric v. Marshall, 766 S.E.2d 396 (W.Va. 2014).)

In its reply, HawaiiUSA argued that its motion for deficiency judgment was proper because Hawaiʻi law does not require such a motion to be filed within a certain time from the date of confirmation. Further, HawaiiUSA argued, the Monalims did not suffer any prejudice because HawaiiUSA did not prevent the Monalims from filing bankruptcy or make representations that it would not seek a deficiency judgment, and the Monalims could still file for bankruptcy. HawaiiUSA also contended that under Hawaiʻi caselaw, the court may refuse to confirm the sale if the highest bid "is so grossly inadequate as to shock the conscience," which it was not in this case. (Quoting Wodehouse v. Hawaiian Trust Co., 32 Haw. 835, 854 (Haw. Terr. 1933).) HawaiiUSA maintained that third party bidders were not discouraged from bidding; HawaiiUSA did not receive a windfall; and the Monalims' due process rights were not violated.

At the hearing on the motion for deficiency judgment, the circuit court asked counsel for HawaiiUSA if there was any reason why it had waited four years to file the motion. Counsel responded that, without going into attorney-client privileged information, counsel could not "comment about any particular client's" propensity to seek a motion. However, counsel contended that once a judgment is obtained it lasts for ten

years and, by analogy, the motion should be considered timely because it was brought within that time period.  The Monalims responded that the analogy worked the opposite way because HawaiiUSA could wait an indefinite amount of time to seek the deficiency judgment, effectively extending the statutory period for collecting the judgment, which was contrary to the legislature's intention to give the borrower some peace by limiting the time period of liability.  HawaiiUSA replied that a further hearing on the deficiency judgment was ordered based on the Monalims' objection at the confirmation hearing and argued that the foreclosure price was reasonable.

On October 13, 2016, the circuit court entered its "Order Granting in Part and Denying in Part [HawaiiUSA's] Motion for Deficiency Judgment Against [the Monalims] Filed January 12, 2016" (Order Granting Deficiency Judgment) and the "Deficiency Judgment Against the [the Monalims] and in Favor of [HawaiiUSA]" (Deficiency Judgment).  The Order Granting Deficiency Judgment awarded HawaiiUSA a deficiency judgment of $493,282.04.[5]  "[D]ue to the delay in filing" the motion, however, the circuit court denied HawaiiUSA's request for interest for the period between the closing date of the sale and the entry of the Deficiency

_____

[5]  The amount included the deficiencies on the two loans, attorneys' fees and costs incurred in the preparation of the motion, and attorneys' fees and cost associated with the Monalims' dismissed ICA appeal.

Judgment, as well as its request for statutory interest for the period after the entry of the Deficiency Judgment. The Order Granting Deficiency Judgment did not address the laches defense raised by the Monalims or their request for a hearing as to the market value of the Property. The Monalims appealed to the ICA.

## C. ICA Proceedings

On appeal, the Monalims maintained that HawaiiUSA's motion for deficiency judgment was barred by laches and that the circuit court should have held evidentiary hearings on prejudice resulting from the untimely motion and on the amount owed.

The ICA entered its Summary Disposition Order (SDO) on May 17, 2018.[6] The ICA held that the Monalims' assertion that the deficiency judgment was required to be determined at the time of the confirmation of sale was without merit because the Monalims objected and sought a further hearing in regard to the deficiency judgment.

The ICA also stated that the Monalims made no discernable argument about laches. Nevertheless, the ICA addressed the prejudice posed by HawaiiUSA's delay in filing the motion, concluding that the order confirming the sale of the Property gave the Monalims notice of the possibility of a deficiency judgment such that their contentions related to

---

[6] The ICA's SDO can be found at HawaiiUSA Fed. Cred. Union v. Monalim, No. CAAP-16-0000807, 2018 WL 2254707 (May 17, 2018).

prejudice were without merit. The ICA additionally found that the Monalims had not requested a hearing on prejudice and held that the circuit court therefore did not deny their request for a hearing. Further, the ICA noted, the circuit court did address potential prejudice to the Monalims when it denied HawaiiUSA's request for continuing interest from the closing date of the sale to the entry of the Deficiency Judgment and for statutory interest after the entry of the Deficiency Judgment. The ICA also pointed to the Monalims' failure to seek a dismissal under Hawaiʻi Rules of Civil Procedure (HRCP) Rule 41(b)(1) or to file a motion to bring closure to the proceedings.

The ICA likewise rejected the Monalims' contention that the circuit court should have held an evidentiary hearing on the amount owed. The ICA ruled that the method for calculating the deficiency was not determined by the Deficiency Judgment but rather the amount was incident to the enforcement of the Foreclosure Judgment. The ICA found that the Monalims had the opportunity to challenge how the deficiency judgment would be calculated in their first appeal, and they failed to do so. The ICA therefore held that the Monalims were precluded by

res judicata from challenging the method of calculating the Deficiency Judgment and affirmed the circuit court.[7]

## II.     STANDARDS OF REVIEW

### A.     Questions of Law

"Questions of law are reviewed de novo under the right/wrong standard of review."  Roes v. FHP, Inc., 91 Hawaiʻi 470, 473, 985 P.2d 661, 664 (1999) (quoting Francis v. Lee Enters., Inc., 89 Hawaiʻi 234, 236, 971 P.2d 707, 709 (1999)).

### B.     Courts Sitting in Equity

The extent of the relief granted by a court in equity rests within the sound discretion of the circuit court and will not be disturbed unless the circuit court abused its discretion. Peak Capital Grp., LLC, v. Perez, 141 Hawaiʻi 160, 172, 407 P.3d 116, 128 (2017); Hawaii Nat'l Bank v. Cook, 100 Hawaiʻi 2, 7, 58 P.3d 60, 66 (2002).  A court abuses its discretion by "issuing a decision that clearly exceeds the bounds of reason or disregard[ing] rules or principles of law or practice to the substantial detriment of the appellant."  Cook, 100 Hawaiʻi at 7, 58 P.3d at 66 (quoting Shanghai Inv. Co. v. Alteka Co., 92 Hawaiʻi 482, 493, 993 P.2d 516, 526 (2000)).

---

[7]     The Monalims further argued as points of error that the deficiency judgment was "contrary to the law of the case," HawaiiUSA waived its right to a deficiency judgment, and they were irreparably prejudiced because they reasonably relied on HawaiiUSA's waiver.  The ICA did not address the merits of these issues.

### C.    Statutory Interpretation

The interpretation of a statute is a question of law that is reviewed de novo.  Deutsche Bank Nat'l Trust Co. v. Greenspon, 143 Hawaiʻi 237, 243, 428 P.3d 749, 755 (2018).

### III.    DISCUSSION

### A.    The Monalims' Challenge to the Deficiency Judgment Is Not Barred by Res Judicata.

The ICA held that res judicata barred the Monalims from challenging the method in which the Deficiency Judgment was calculated because they failed to raise the issue in their appeal of the Foreclosure Judgment.  It is true that the doctrine of res judicata prohibits parties from relitigating a previously adjudicated cause of action or claims that could have been brought in a previous action between the same parties but were not.  Mortg. Electr. Registration Sys., Inc. v. Wise, 130 Hawaiʻi 11, 17-18, 304 P.3d 1192, 1198-99 (2013).  However, under this court's precedents, "foreclosure cases are bifurcated into two separately appealable parts: (1) the decree of foreclosure and the order of sale, if the order of sale is incorporated within the decree, and (2) all other orders."  Id. at 16, 304 P.3d at 1197 (quoting Sec. Pac. Mortg. Corp. v. Miller, 71 Haw. 65, 70, 783 P.2d 855, 857 (1989)).  And the bifurcated nature of mortgage foreclosure proceedings is treated as two separate

proceedings for res judicata purposes.  Id. at 17, 304 P.3d at 1198.

Additionally, Hawaiʻi Revised Statutes (HRS) § 667-51(a) (Supp. 2010) sets forth the specific orders that are deemed final and appealable in the foreclosure context.  Section 667-51(a)(1)[8] provides that an adjudication of the right to a deficiency judgment incorporated into a judgment on a decree of foreclosure is final and appealable.  Separately, section 667-51(a)(3)[9] states that an appeal may be taken from the amount

---

[8]      HRS § 667-51(a)(1) provides as follows:

(a) Without limiting the class of orders not specified in section 641-1 from which appeals may also be taken, the following orders entered in a foreclosure case shall be final and appealable:

(1) A judgment entered on a decree of foreclosure, and if the judgment incorporates an order of sale or an adjudication of a movant's right to a deficiency judgment, or both, then the order of sale or the adjudication of liability for the deficiency judgment also shall be deemed final and appealable[.]

Additionally, HRS § 667-51(a)(2) provides that, in the event it is not incorporated with another order, "[a] judgment entered on an order confirming the sale of the foreclosed property," is appealable "if the circuit court expressly finds that no just reason for delay exists, and certifies the judgment as final pursuant to rule 54(b) of the Hawaii rules of civil procedure[.]"

[9]      HRS § 667-51(a)(3) provides that the following order entered in a foreclosure case shall be final and appealable:

(3) A deficiency judgment; provided that no appeal from a deficiency judgment shall raise issues relating to the judgment debtor's liability for the deficiency judgment (as opposed to the amount of the deficiency judgment), nor shall the appeal affect the finality of the transfer of title to the foreclosed property pursuant to the order confirming sale.

of a deficiency judgment provided that the appeal does not raise issues related to the judgment debtor's right to the deficiency judgment or affect the finality of the transfer of title of the foreclosed property.  It is thus unsurprising that in Wise, this court held that the defendant's "timely appeal from the Deficiency Judgments would entitle it to challenge errors unique to it, such as an erroneous upset price or miscalculation of deficiency."[10]  130 Hawaiʻi at 16, 304 P.3d at 1197 (second emphasis added) (quoting Miller, 71 Haw. at 71, 783 P.2d at 858).

The ICA misapprehended this holding in concluding that because the Monalims failed to challenge the method for calculating the deficiency in their appeal of the Foreclosure Judgment--which was dismissed--they were barred by res judicata from challenging it in an appeal of the Deficiency Judgment.  In Wise, the petitioner appealed from an order confirming sale, challenging the respondent's standing to bring the foreclosure suit "in the first place."  130 Hawaiʻi at 15, 17, 304 P.3d at 1196, 1198.  We concluded that because the issue of standing could have been raised at any time, it was not "unique" to the confirmation of sale and should therefore have been challenged

---

[10]     Although the court did not cite HRS § 667-51(a) as a basis for its decision in Wise, its holding is consistent with the statute.

16

in an appeal from the judgment of foreclosure.  Id. at 17, 304 P.3d at 1198.

In contrast to the standing issue before the Wise court, the Monalims' appellate challenge is to the method by which the circuit court calculated the deficiency judgment, which pertains to the amount of the deficiency judgment--not HawaiiUSA's right to collect it "in the first place."  See id. at 15, 17, 304 P.3d at 1196, 1198.  When the Monalims' appeal of the Foreclosure Judgment was dismissed by the ICA, the Monalims lost the ability to contest HawaiiUSA's right to a deficiency judgment pursuant to the Foreclosure Judgment.  However, pursuant to HRS § 667-51(a)(3) and this court's precedents, the Monalims may still appeal the Deficiency Judgment as long as their challenge contests the calculation of the deficiency amount and not HawaiiUSA's right to the deficiency judgment under the Foreclosure Judgment.  The Foreclosure Judgment did not set out the amount or method for calculating the deficiency judgment.  Because the Monalims were not required to contest the amount of the deficiency judgment in their appeal from the Foreclosure Judgment, the prior proceeding does not implicate res judicata.  The ICA therefore erred in concluding that the

Monalims were barred from contesting the method for calculating the amount of the deficiency judgment.[11]

## B. The Circuit Court Failed To Address the Monalims' Laches Argument.

"Mortgage foreclosure is a proceeding equitable in nature and is thus governed by the rules of equity." Beneficial Hawaii, Inc. v. Kida, 96 Hawaiʻi 289, 312, 30 P.3d 895, 918 (2001). An equity court's sound discretion is not bound by strict rules of law, but it can be molded to do justice. Id. Although laches was originally a doctrine reserved for equitable proceedings like the present case, this court has stated that, in the State of Hawaiʻi, "laches is a defense in all civil actions." Ass'n of Apartment Owners of Royal Aloha v. Certified Mgmt., Inc., 139 Hawaiʻi 229, 235, 386 P.3d 866, 872 (2016). Therefore, laches is a defense against a motion for deficiency judgment. See BayBank Conn., N.A., v. Thumlert, 610 A.2d 658, 662 (Conn. 1992) ("[A] defendant who is demonstrably prejudiced by a plaintiff's delay in filing a motion for deficiency judgment may invoke the equitable defense of laches."); E. Banking Co. v. Robbins, 149 N.W. 779, 780 (Neb. 1914) (holding

---

[11]    We also overrule the following ICA cases to the extent that they held that res judicata barred the mortgagee from challenging the method in which the deficiency judgment was calculated: Ke Kailani Partners, LLC v. Ke Kailani Dev. LLC, Nos. CAAP-12-0000758 & CAAP-12-0000070, 2016 WL 2941054 (App. Apr. 29, 2016) (mem.); LCP-Maui, LLC v. Tucker, No. CAAP-15-0000109, 2018 WL 1082855 (App. Feb. 28, 2018) (SDO).

that "a court of equity in the exercise of its inherent power to deny relief on account of laches, independently of the statute of limitations, should refuse to enter a deficiency judgment" when the petitioner had waited more than 14 years).

The doctrine of laches reflects the maxim that equity aids the vigilant, not those who slumber on their rights.  Small v. Badenhop, 67 Haw. 626, 640, 701 P.2d 647, 656 (1985).  There are two prongs of the laches defense, both of which must be satisfied in order for the doctrine to become applicable:

> First, there must have been a delay by the plaintiff in bringing his claim, and that delay must have been unreasonable under the circumstances.  Delay is reasonable if the claim was brought without undue delay after plaintiff knew of the wrong or knew of facts and circumstances sufficient to impute such knowledge to him. Second, that delay must have resulted in prejudice to defendant.

Herrmann v. Herrmann, 138 Hawaiʻi 144, 153, 378 P.3d 860, 869 (2016) (quoting Adair v. Hustace, 64 Haw. 314, 321, 640 P.2d 294, 300 (1982)).

Despite ruling that the Monalims made no discernable argument as to a laches defense, the ICA also stated that the Monalims' arguments as to prejudice--the second prong of laches--were without merit.  However, a review of the record demonstrates that the Monalims raised substantive arguments as to both of the defense's requirements.

When evaluating the first prong of laches, a court considers whether, under the circumstances, the delay in

19

bringing the claim was unreasonable. Id. In this case, the judgment confirming the sale was entered on December 22, 2011. More than four years later, on January 12, 2016, HawaiiUSA filed its motion for deficiency judgment. The Monalims argued in their opposition to HawaiiUSA's motion that the four-year delay was unprecedented, and that HawaiiUSA had provided no explanation for the delay in its submissions to the court. And when asked directly during the hearing on the motion, counsel for HawaiiUSA declined to provide an explanation for the delay, citing attorney-client privilege. The Monalims' establishment of a four-year delay in HawaiiUSA seeking to recover a deficiency amount from the Monalims and the lack of any explanation for this delay by HawaiiUSA satisfied the Monalims' burden to adduce sufficient facts to raise a laches defense with regard to the first prong. Cf. Herrmann, 138 Hawaiʻi at 153-54, 378 P.3d at 869-70 (noting that the plaintiff did not proffer a satisfactory excuse for the almost seven-year delay in bringing suit); see also In re Kawai, 36 Haw. 533, 536 (Haw. Terr. 1943) (observing that a party who waited nearly five years after the final order of distribution before commencing an action to revoke a will did not provide a "satisfactory excuse").

As to the second prong, that the delay must have resulted in prejudice to the defendant, we have stated, "What qualifies as prejudice for purposes of the laches doctrine

invariably depends on the facts and circumstances of a particular case, but it is ordinarily understood as anything that places the defendant 'in a less favorable position.'" Herrmann, 138 Hawaiʻi at 154, 378 P.3d at 870 (citing 27A Am.Jur.2d Equity § 143 (2008)).

At the circuit court, the Monalims averred in a declaration that they had planned to file a Chapter 7 Bankruptcy Petition to discharge the potential deficiency judgment but had abandoned their plan "after waiting close to a year" in anticipation of the deficiency judgment. In the interim, the Monalims explained, they had each started a business, started saving for their daughter's college tuition, and were only months from clearing the foreclosure from their credit reports. The Monalims argued to the circuit court that the deficiency judgment would "wipe out" all of their financial gains since the confirmation of sale, which would not have occurred if HawaiiUSA moved for a deficiency judgment in 2011. The Monalims therefore contended that they would be in a significantly worse position-- and suffer significant prejudice--as a result of HawaiiUSA's delay.

The Monalims thus alleged facts concerning each prong of their laches defense. See Kerrigan v. Kerrigan, 642 A.2d 1324, 1327 (D.C. App. 1994) (holding that the defendant made a prima facie showing sufficient to establish that injustice would

21

result from the plaintiff's unexplained eight-year delay in bringing suit based on evidence that the defendant's financial situation had greatly changed in the interim). The ICA in this case thus clearly erred in holding that the Monalims made no discernable argument as to a laches defense. Additionally, despite the presentation of the defense, the circuit court did not render findings of fact and conclusions of law or otherwise rule upon the applicability of the Monalims' laches defense in its Order Granting Deficiency Judgment or the Deficiency Judgment.

The present case is analogous to Herrmann v. Herrmann, in which the plaintiff brought a motion for post-decree relief against the defendant to recover overpaid child support approximately seven years after being notified about the overpayments. 138 Hawaiʻi at 147-48, 378 P.3d at 863-64. The defendant argued that the seven-year delay was unreasonable and that the plaintiff provided no explanation for waiting to bring the action for reimbursement. Id. at 148, 378 P.3d at 864. The family court denied the plaintiff's motion, citing the seven-year delay in raising the issue and concluding that the plaintiff was "estopped" from pursuing the claim. Id. at 150, 378 P.3d at 866. On appeal, the ICA determined that the family court's decision was based on "estoppel by laches" and that the family court had not made an independent conclusion as to

22

prejudice.  Id. at 150, 378 P.3d at 866.  Applying its own judgment, the ICA held that both requirements of "estoppel by laches" were not present, and it accordingly vacated the family court's decision.  Id. at 150-53, 378 P.3d at 866-69.

On review, this court determined that there were three possible explanations for the family court's failure to make findings of fact as to prejudice: (1) the family court did not apply the laches doctrine; (2) the court implicitly found that the prejudice prong had been satisfied; or (3) the family court failed to recognize that prejudice was a required prong for the application of laches.  Id. at 155, 378 P.3d at 871.  Because of the family court's silence, we stated that it was uncertain whether the prejudice prong had been satisfied, and the case was remanded to the family court to render factual findings with respect to whether the defendant was prejudiced by the delay. Id.

Similarly, there are at least three possible explanations for the circuit court's silence regarding the Monalims' laches defense: (1) the circuit court implicitly concluded that laches was inapplicable because it determined that there was no unreasonable delay or that the Monalims suffered no prejudice; (2) the circuit court failed to properly apply the laches defense; or (3) the circuit court failed to duly consider the Monalims' laches defense.  That is to say,

23

based on the circuit court's lack of findings as to the laches defense, we are unable to determine on review whether the circuit court appropriately considered this defense presented by the Monalims.[12]  See 138 Hawaiʻi at 155, 378 P.3d at 871.

The ICA alternatively held that the circuit court addressed the potential prejudice to the Monalims by denying HawaiiUSA's requested interest on the deficiency amount. However, as our holding in Herrmann illustrates, because the circuit court did not issue any findings with regard to prejudice, we cannot know whether this constituted appropriate consideration of the laches defense.  See Herrmann, 138 Hawaiʻi at 155-56, 378 P.3d at 871-72.  The ICA also concluded that the Monalims were on notice of the deficiency amount such that their contentions related to prejudice were without merit.  Though the

---

[12]  The concurring and dissenting opinion (dissent) agrees with our conclusion that the circuit court erred by failing to address the Monalims' laches argument, but it then proceeds to consider and rule on the merits of the Monalims' claim as if it were in the position of the trial court. Dissent at 23.  When an appellate court discerns that a trial court has failed to make a finding because of an erroneous view of the law, the standard rule is that the case should be remanded to the trial court to permit that court to evaluate and render the findings that should have been made in the first instance.  Pullman-Standard v. Swint, 456 U.S. 273, 291 (1982).  The only exception to this rule is when the record permits only one resolution of the factual issue.  Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 387 (2008).  Because the trial court in this case failed to rule upon the applicability of the Monalims' laches defense and rendered no findings of facts on this defense, this court is clearly not in a position to rule as a matter of law regarding factual aspects of the Monalims' laches defense.  We accordingly decline to deviate from the basic principle of law that fact-finding should be left to the fact-finder.  See also Goo v. Arakawa, 132 Hawaiʻi 304, 317, 321 P.3d 655, 668 (2014) ("[A] trial court is better equipped than an appellate court operating at a distance to fashion equitable relief.").

fact that the Monalims were on notice of the potential deficiency judgment against them in 2011 is part of the circumstances to be considered by the circuit court in evaluating the prejudice prong, it is not dispositive of the Monalims' contention that they have been prejudiced by HawaiiUSA's delay in pursuing the deficiency judgment, nor can we conclude that this fact was actually considered by the circuit court.[13]  See id.; Badenshop, 67 Haw. at 640, 701 P.2d at 657 ("Prejudice has been found . . . where changes in the value of the subject matter <u>or in the defendant's position have occurred</u>[.]" (emphasis added)).

In sum, we hold that the ICA erred in affirming the circuit court's Deficiency Judgment without the circuit court having demonstrably addressed the Monalims' laches defense.[14]

---

[13]    The ICA also noted that the Monalims did not seek a dismissal order or file any motions to bring closure to the proceeding.  However, under a laches analysis, the Monalims are not required to show they actively tried to bring the proceedings to a close to demonstrate prejudice.

[14]    The Monalims also argued to the ICA that the Deficiency Judgment violated the "Law of the Case" and that HawaiiUSA waived its right to the deficiency judgment.  On certiorari review, the Monalims additionally argue the defense of estoppel by acquiescence.  The Monalims' contentions are premised on their interpretation of the term "shall" in the provision in the Foreclosure Order granting HawaiiUSA the right to a deficiency judgment.

> At the hearing for confirmation of sale, if it appears that the proceeds of the sale of the Mortgaged Property are insufficient to pay all amounts due and owing to [HawaiiUSA], [HawaiiUSA] <u>may</u> request a deficiency judgment in its favor and against the [Monalims] for the amount of the deficiency which <u>shall</u> be determined at the time of confirmation and have immediate execution thereafter.

(continued . . .)

And thus, the Order Granting Deficiency Judgment and the Deficiency Judgment must be vacated, and on remand the circuit court shall consider and render a determination on the Monalims' laches defense.[15]

## C. The Traditional Approach to Determining a Deficiency Judgment May Hold Mortgagors Liable for More than What Is Owed and Grant Mortgagees a Windfall.

In what appears to be a matter of first impression before this court, we review the method by which Hawaiʻi courts calculate deficiency judgments. The Monalims argue that courts in Hawaiʻi "matter-of-factly" calculate a deficiency judgment by subtracting the net proceeds of the foreclosure sale from the mortgage debt owed without considering evidence of the foreclosed property's true market value at the time of sale. The Monalims contend that lower courts should be instructed to hold an evidentiary hearing to determine the true value of a property when calculating a deficiency judgment, and that this

---

(. . . continued)

(Emphases added.)

On its face, the term "shall" in the provision relates only to when the court intended to determine the amount of the deficiency judgment should one be requested. By contrast, the order specified that HawaiiUSA "may" request a deficiency judgment at the hearing on the confirmation of sale--a right HawaiiUSA appears to have exercised. We therefore hold that these arguments are without merit.

[15]     In light of our disposition, we do not address the Monalims' contention that the circuit court should have conducted a separate evidentiary hearing on prejudice.

amount should be deducted from the mortgage debt in lieu of the sale price if it is the greater of the two.

Determination of the amount of a deficiency judgment generally follows two approaches. Under the traditional approach, the price obtained at a foreclosure sale is the "conclusive measure" of the amount to be deducted from the outstanding mortgage debt. Restatement (Third) of Property: Mortgages § 8.4 cmt. a. (Am. Law Inst. 1997).[16] The amount of the deficiency judgment is thus automatically calculated by subtracting the foreclosure sale price from the outstanding mortgage debt. 1 Grant S. Nelson & Dale A. Whitman, Real Estate Finance Law § 8:3 (6th ed. 2014). A majority of jurisdictions have rejected this approach, however. "Whether by judicial decision or by statute, the majority view 'afford[s] the deficiency defendant the right to insist that the greater of the fair market value[17] of the real estate or the foreclosure sale price be used in calculating the deficiency.'" Sostaric v.

---

[16] "At the opposite extreme, some states flatly prohibit deficiency judgments in certain contexts." Restatement (Third) of Property: Mortgages § 8.4 Reporters' Note to cmt. a.

[17] The exact terminology used varies by jurisdiction and includes, for example, "fair market value," "true market value," "actual value," "reasonable value," "fair value," and "true value." See Restatement (Third) of Property: Mortgages § 8.4 Reporters' Note to cmt. a. This opinion treats these terms interchangeably with "fair market value" and defines "fair market value" as "the price which would result from negotiation and mutual agreement, after ample time to find a purchaser, between a vendor who is willing, but not compelled to sell, and a purchaser who is willing to buy, but not compelled to take a particular piece of real estate." Id. § 8.4 cmt. c (defining "fair market value").

Marshall, 766 S.E.2d 396, 400 (W.Va. 2014) (footnote omitted) (quoting Restatement (Third) of Property: Mortgages § 8.4 cmt. a).

Scholars of foreclosure law have observed that the price obtained at a foreclosure sale is often far below the fair market value of the property as a result of the forced nature of a foreclosure sale. Robert M. Washburn, The Judicial and Legislative Response to Price Inadequacy in Mortgage Foreclosure Sales, 53 S. Cal. L. Rev. 843, 848 (1980); Nelson & Whitman, supra. In times of economic depression a foreclosed property is likely to bring an even lower price. Nelson & Whitman, supra. Measuring the deficiency judgment based on the foreclosure sale price therefore may result in a double-loss to the deficiency debtor: the debtor has lost the foreclosed property, and the debtor has not been credited the actual value of the property against the outstanding mortgage debt. See Restatement (Third) of Property: Mortgages § 8.4 cmt. a; Washburn, supra, at 850.

Conversely, these conditions may allow a mortgagee to potentially recover more than the original mortgage debt owed to it. This situation occurs, for example, when a mortgagee purchases the property during a foreclosure sale at a price below its fair market value, obtains a deficiency judgment for the difference between the foreclosure price and the outstanding mortgage debt, and then resells the property at or above its

28

fair market value. Restatement (Third) of Property: Mortgages § 8.4 cmt. a; Nelson & Whitman, supra; Washburn, supra, at 849. The traditional approach to calculating a deficiency judgment thus may produce inequity between mortgagors and mortgagees by holding a mortgagor liable for more than what is owed and granting mortgagees a windfall they are not due. This has prompted several state legislatures since the 1930s to abandon the traditional approach and instead mandate the use of a property's fair market value as the minimum measure for determining a deficiency judgment.[18] Nelson & Whitman, supra.

In addition to the states that have adopted the majority view through legislation, several state courts have adopted the majority view through judicial decision. In Trustees of Washington-Idaho-Montana-Carpenters Employers Retirement Trust Fund v. Galleria Partnership, for example, the Supreme Court of Montana was called upon to review a $1,308,193.35 deficiency judgment against the defendants, whose foreclosed property had been valued at $1,100,000 two years prior to a sheriff's sale but was sold for $565,000. 780 P.2d 608, 609, 611 (Mont. 1989). The court determined that its own

---

[18] At least 23 states statutorily define a deficiency using the "fair value" of the foreclosed property. See Restatement (Third) of Property: Mortgages § 8.4 Reporters' Note to cmt. a; Sostaric, 766 S.E.2d at 400 n.11. Of those that have not, many prohibit deficiency judgments entirely or with respect to purchase money mortgages. See Restatement (Third) of Property: Mortgages § 8.4 Reporters' Note to cmt. a.

statutes were silent as to the duty of the court to determine whether the sheriff's sale reflected the fair market value of the foreclosed property. Id. at 616-17. The court observed, however, that the majority of the neighboring states had statutes that "limited [a deficiency judgment] to the difference between the fair market value of the secured property at the time of the foreclosure sale, regardless of a lesser amount realized at the sale, and the outstanding debt for which the property was secured." Id. at 616-17. The Ninth Circuit had recognized that the purpose of two of those states' statutes was to prevent the injustice that befalls the judgment debtor whose foreclosed property brings a price significantly less than its fair market value, the Montana court noted. Id. at 617 (citing U.S. v. MacKenzie, 510 F.2d 39, 41 (9th Cir. 1975)). In the exercise of its equity jurisdiction, the court deemed it proper to remand the case for determination of the property's fair market value as of the time of the sheriff's sale, which would then be used to calculate the deficiency judgment. Id.

The Supreme Court of West Virginia has similarly adopted the majority view through judicial decision. In Sostaric v. Marshall, the court noted that, while the governing state statute was silent as to whether the value of real property could be challenged at a deficiency judgment proceeding, the court had previously applied common law

30

principles of equity to set aside foreclosure sales. 766 S.E.2d at 403. Concluding that adoption of the majority view would, inter alia, prevent a creditor from receiving a windfall at the expense of a deficiency defendant, the court overruled its previous precedent in favor of adopting the majority view. Id. at 405. Thus, state supreme courts have not shied from using their inherent equity powers to adopt the majority view to create fairness between the parties in foreclosure proceedings. See also Wansley v. First Nat. Bank of Vicksburg, 566 So.2d 1218, 1223-25 (Miss. 1990) (holding that every aspect of the foreclosure sale must be "commercially reasonable"); Vantium Capital, Inc. v. Hobson, 137 So.3d 497, 499 (Fla. Ct. App. 2014) (utilizing the "fair market value" as the measure for awarding a deficiency decree); Licursi v. Sweeney, 594 A.2d 396, 398-99 (Vt. 1991) (using the "value" of the property as the measure to determine whether a deficiency existed).

In 1997, the American Law Institute also adopted the majority approach in the Restatement (Third) of Property: Mortgages § 8.4. As set forth in the Restatement, the deficiency judgment debtor may request a determination of the "fair market value" of foreclosed property as of the date of the foreclosure sale. Restatement (Third) of Property: Mortgages § 8.4(c). If the fair market value is greater than the foreclosure price, the deficiency judgment debtor is entitled to

offset the deficiency against the fair market value.  Id.

§ 8.4(d).  Determination of a property's fair market value is

not automatic and must be requested by a deficiency judgment

debtor.  Id. § 8.4 cmt. b.  Thus, the Restatement "adopts the

position of the substantial number of states that, by

legislation or judicial decision," allow for the calculation of

the deficiency award using the greater of the fair market value

or foreclosure price.  Id. § 8.4 cmt. a.

In adopting the majority view, the Restatement's

approach is aimed at making the mortgagee whole while

simultaneously preventing the unjust enrichment that could

result from the traditional approach:

> This approach enables the mortgagee to be made whole where
> the mortgaged real estate is insufficient to satisfy the
> mortgage obligation, but at the same time protects against
> the mortgagee purchasing the property at a deflated price,
> obtaining a deficiency judgment and, by reselling the real
> estate at a profit, achieving a recovery that exceeds the
> obligation.

Id.  Logically, the majority rule protects a mortgagee against

any loss that would occur from a sale of the property at less

than its fair market value because the mortgagee retains the

option of tendering a credit bid for the amount of the

outstanding mortgage debt and obtaining the property without

additional monetary payment if there are no greater bids.  The

dissent disagrees, arguing that "the mortgagee will still not be

made whole if the outstanding mortgage debt exceeds the fair

market value of the property." Dissent at 22. But this focus on cases in which the outstanding mortgage debt exceeds the fair market value of the property "deflects consideration of the risk management techniques available to lenders when the loan is made."[19] See Sostaric, 766 S.E.2d at 404 n.17 (quoting First Bank v. Fischer & Frichtel, Inc., 364 S.W.3d 216, 227 n.5 (Mo. 2012) (Teitelman, C.J., dissenting)). Further, by allowing the deficiency judgment debtor to request a determination of the fair market value, the Restatement's approach protects the mortgagor from the danger of double-loss that would result from "a deficiency judgment that does not fairly recognize the value" of the foreclosed property. Restatement (Third) of Property: Mortgages § 8.4 cmt. a; see also CSA 13-101 Loop, LLC v. Loop 101, LLC, 341 P.3d 452, 456 (Ariz. 2014) ("Restatement § 8.4 seeks to protect against artificially increased deficiencies.").

---

[19] As stated by the Sostaric court:

> A lender compensates for risk by charging an interest rate that is set both by the financial markets and by the lender's assessment of the borrower's creditworthiness. The lender also manages risk by appraising the fair market value of the property to ensure that the loan is adequately secured. Changing to a fair market value approach certainly would lessen the lender's chance of a large windfall and would mean only that [the mortgagee], like the borrower, is losing or gaining money based on fair market value of property. The risk of loss is part of the risk of lending. That risk of loss should not be borne solely by the borrower and then amplified by measuring the deficiency by reference to the foreclosure sale price.

Sostaric, 766 S.E.2d at 404 n.17 (quoting First Bank v. Fischer & Frichtel, Inc., 364 S.W.3d 216, 227 n.5 (Mo. 2012) (Teitelman, C.J., dissenting)).

Thus, section 8.4 of the Restatement provides a greater balance of the equities between mortgagor and mortgagee in the foreclosure process than the traditional approach.

**D. We Adopt the Majority Approach Because It Is Consistent with Principles of Equity and Hawaiʻi Law.**

In Hawaiʻi, HRS § 667-1.5 (Supp. 2015) authorizes foreclosure by action and provides as follows:

> The circuit court may assess the amount due upon a mortgage, whether of real or personal property, without the intervention of a jury, and shall render judgment for the amount awarded, and the foreclosure of the mortgage. Execution may be issued on the judgment, as ordered by the court.

Our interpretation of statutes is guided by the following well-settled principles:

> First, the fundamental starting point for statutory-interpretation is the language of the statute itself. Second, where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning. Third, implicit in the task of statutory construction is our foremost obligation to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. Fourth, when there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

State v. Castillon, 144 Hawaiʻi 406, 411, 443 P.3d 98, 103 (2019) (quoting Panado v. Bd. of Trs., Emps.' Ret. Sys., 134 Hawaiʻi 1, 11, 332 P.3d 144, 154 (2014)). Therefore, our interpretation of HRS § 667-1.5 must begin with the language of the statute itself. HRS § 667-1.5 plainly states that the circuit court "may assess the amount due upon a mortgage . . . and shall render judgment for the amount awarded." By its use of the word

34

"may" the legislature has permitted courts to exercise discretion in assessing the amount due on a mortgage, "without the intervention of a jury." HRS § 667-1.5. Further, the statute confers on the court "specific authority to render a deficiency judgment, as an incident to the foreclosure." Bank of Honolulu, N.A. v. Anderson, 3 Haw. App. 545, 549, 654 P.2d 1370, 1374 (1982) (emphasis omitted) (citing 2 Committee on Coordination of Rules and Statutes, Report of Committee on Coordination of Rules and Statutes (1971)). Under its plain language, Chapter 667 (governing foreclosures) does not mandate either the traditional or majority approach to calculating deficiency judgments. Instead, the legislature has left the determination of the amount due in a deficiency judgment and thereby the method for its calculation to the discretion of the courts.

The Monalims contend that courts in Hawaiʻi currently determine a deficiency judgment by mechanically subtracting the price obtained at a foreclosure sale from the outstanding mortgage debt. They ask that this court follow the approach of the majority of states and the Restatement by requiring lower courts to conduct an evidentiary hearing to determine the fair market value of a foreclosed property when calculating a deficiency judgment. Citing Wodehouse v. Hawaiian Trust Co., 32 Haw. 835, 854 (Haw. Terr. 1933), HawaiiUSA argues that no such

35

inquiry is required under Hawaiʻi law and contends that our caselaw requires the mortgagor to bear the burden of any loss unless the foreclosure price "is so grossly inadequate as to shock the conscience."

In Wodehouse, the trial court ordered the foreclosure and sale of property at a public auction with an upset price of $82,000. Id. at 840. After the property twice failed to receive any bids, the court gave the mortgagees a choice between taking possession of the mortgaged property as credit for $82,000 of the debt or postponing the sale to a later date. Id. The mortgagees declined both options, but the court nonetheless ordered the conveyance of the property to the mortgagees and credited the mortgagor $82,000 toward their outstanding debt. Id.

On appeal, the Supreme Court of the Territory of Hawaiʻi concluded that while a court may refuse to confirm a sale where "the highest bid offered is so grossly inadequate as to shock the conscience," the trial court could not compel the mortgagee to purchase the property at a price set by the court because the mortgagee had a contractual right to foreclose on the property. Id. at 852-54. The court therefore set aside the trial court's decree and remanded the case to the lower court with instructions to have the property offered at public auction under foreclosure. Id. at 854.

36

Wodehouse thus dealt with the court's discretion with regard to the sale and confirmation of sale of a foreclosed property and not with the separate question of whether and for what amount a deficiency judgment is due.  See Wansley, 566 So.2d at 1224 (holding that the rule that "a foreclosure sale may not be set aside unless the sales price is so inadequate as to shock the conscience . . . . has nothing whatsoever to do with the separate and distinct question of what, if any, deficiency judgment may be allowed" (citations omitted)).  Wodehouse is therefore not controlling with regard to the question presently before the court.

"Mortgage foreclosure is a proceeding equitable in nature and is thus governed by the rules of equity."  Beneficial Hawaii, Inc. v. Kida, 96 Hawaiʻi 289, 312, 30 P.3d 895, 918 (2001).  A court sitting in equity has the power to mold its decrees to conserve the equities of the parties under the circumstances.  Peak Capital Grp., LLC v. Perez, 141 Hawaiʻi 160, 179, 407 P.3d 116, 135 (2017).  When considering the equities in a foreclosure case, "all of the equities must be considered" including "[t]he equities affecting the mortgagees . . . as well as those affecting the mortgagors."  Wodehouse, 32 Haw. at 842.  The equitable discretion provided to our courts by HRS § 667-1.5 is therefore governed by principles of equity and fairness.

As observed in the commentary to the Restatement, the majority rule "enables the mortgagee to be made whole" and "also protects the mortgagor from the harsh consequences of suffering both the loss of the real estate and the burden of a deficiency judgment that does not fairly recognize the value of that real estate."  Restatement (Third) of Property: Mortgages § 8.4 cmt. a.  By contrast, the traditional approach is susceptible to abuse, potentially permitting a mortgagee to reap an undue windfall at a mortgagor's expense.  Id.  The commentary goes on to note that "[t]he approach of this section is embodied in statutes in many jurisdictions, but the principles of this section are applicable whether a statute requires it or not." Id. (emphasis added).  Because the equities clearly weigh in favor of the majority approach, we now adopt section 8.4 of the Restatement (Third) of Property as Hawaiʻi law.  We thus hold that a deficiency defendant "may request . . . a determination of the fair market value of the real estate as of the date of the foreclosure sale."  Id. § 8.4(c).[20]

_____

[20]    Pursuant to HRS § 667-1.5, the court may determine the fair market value of the property "without the intervention of a jury."  Section 8.4 of the Restatement (Third) of Property, which we expressly adopt, gives guidance on how the fair market value may be calculated.  Comment c to section 8.4 provides as follows:

> The determination of fair market value may appropriately utilize a variety of approaches including (1) the "market data" approach indicated by recent sales of comparable properties; (2) the "income approach," or the value which the real estate's net earning power will support based upon

(continued . . .)

The dissent asserts that by adopting section 8.4 of the Restatement (Third) of Property, which accords with the rule in the majority of jurisdictions and the modern trend, this court usurps the legislature's role. Dissent at 10, 13, 13 n.4, 22-23. The dissent's contention is groundless in light of the fact that the legislature, through HRS § 667-1.5, has expressly provided that the determination of the amount due in a deficiency judgment, and thereby the method for its calculation, is entrusted to the discretion of the courts. HRS § 667-1.5 ("The circuit court may assess the amount due upon a mortgage . . . and shall render judgment for the amount awarded, and the foreclosure of the mortgage."). By not specifying a method of calculation, the legislature authorized the courts to exercise discretion in determining how to calculate deficiency judgments. Nothing in the language of HRS § 667-1.5 suggests that the legislature sought to circumscribe a court's discretion in this regard by precluding consideration of the fair market value of

---

(. . . continued)

> a capitalization of net income; and (3) the current cost of reproducing the property less depreciation.

> Additionally, we adopt section 8.4's prohibition on the advance waiver of the right to a determination of the fair market value because "[i]f such waiver were permitted, most mortgage forms would routinely incorporate waiver language and the impact of this section would be significantly weakened." Id. § 8.4 Reporters' Note to cmt. b.

the foreclosed property.[21]  The dissent's assertion reflects a core misunderstanding of the legal principle at the foundation of this opinion--the application of a statute to the facts of a case.  It is axiomatic that it is "the province and duty of the judicial department to say what the law is."  Marbury v. Madison, 5 U.S. 137, 177 (1803).  And accordingly, "[t]hose who apply the rule to particular cases, must of necessity expound and interpret that rule."  Id.

Despite the clear language of the statute, the dissent claims that our interpretation of HRS § 667-1.5 is "misguided." Dissent at 18.  Specifically, the dissent first posits that a court's assessment of "the amount due upon a mortgage" under HRS § 667-1.5 is not related to the amount of a subsequent deficiency judgment, but instead refers to a determination of the amount due on the mortgage before a foreclosure sale has taken place.  Dissent at 15.  However, the dissent's interpretation is directly contrary to longstanding precedent. See Anderson, 3 Haw. App. at 549, 654 P.2d at 1374 ("[HRS § 667-1.5] does not require the determination of a sum certain before foreclosure is decreed since a deficiency judgment is rendered only after the sale of the mortgaged property.") (emphases

---

[21]     Indeed, at oral argument HawaiiUSA's counsel acknowledged that the circuit court could, under the right procedural circumstances, consider the fair market value of a foreclosed property.  Oral Argument at 00:59:45-01:00:10, HawaiiUSA v. Monalim, (No. SCWC-16-0000807), http://oaoa.hawaii.gov /jud/oa/19/SCOA_011119_SCWC_16_807.mp3 [https://perma.cc/TBK2-9K9G].

added) (citing Indep. Mortg. Tr. v. Glenn Constr. Corp., 57 Haw. 554, 555 n.1, 560 P.2d 488, 489 n.1 (1977)).[22]

Second, the dissent maintains that HRS § 667-1.5 does not vest any discretion in the courts to determine the method by which deficiency judgments are calculated. Particularly, the dissent relies on the fact that HRS § 667-1.5 does not contain language that "expressly permit[s] the court to consider fair market value." Dissent at 16. But it is this very absence of

_____

[22] The dissent criticizes our citation to Anderson because, the dissent asserts, it is a decision of the ICA that "this court has never referenced or adopted." Dissent at 15 n.5. Respectfully, this is a misstatement of our jurisprudence. See Bank of America, N.A. v. Reyes-Toledo, 139 Hawaiʻi 361, 367, 390 P.3d 1248, 1254 (2017) (citing Anderson for the rule that a foreclosing party must prove the existence of an agreement, the terms of the agreement, a default by the mortgagor under the terms of the agreement, and the giving of the cancellation notice in order to prove entitlement to foreclose); Bank of N.Y. Mellon v. R. Onaga, Inc., 140 Hawaiʻi 358, 361, 370, 400 P.3d 559, 562, 571 (2017) (affirming circuit court's judgment confirming the sale of foreclosed property after the foreclosing party proved it was entitled to foreclosure under the "[Anderson] requirements").
    The dissent then asserts that its interpretation of HRS § 667-1.5 is in fact consistent with the interpretation of the statute in Anderson. To reiterate, the dissent interprets HRS 667-1.5's statement that "[t]he circuit court may assess the amount due upon a mortgage" as referring to the determination of the amount due upon the mortgage before a foreclosure sale takes place. Dissent at 15. In Anderson, the ICA rejected a foreclosure defendant's contention that the decree of foreclosure, which entitled the foreclosing party to a foreclosure sale, was invalid because it failed to specify the actual amount due on the mortgage. The rule set out by the ICA in Anderson, which we adopted in Reyes-Toledo, is that the foreclosing party need only prove the existence of an agreement, the terms of the agreement, a default by the mortgagor under the terms of the agreement, and the giving of the cancellation notice in order to prove entitlement to foreclose. Anderson, 3 Haw. App. at 549, 654 P.2d at 1374; Reyes-Toledo, 139 Hawaiʻi at 367, 390 P.3d at 1254. Our law does not burden the foreclosing party with the obligation to prove the amount due on the mortgage before the foreclosure sale because "a deficiency judgment is rendered only after the sale of the mortgaged property." Anderson, 3 Haw. App. at 549, 654 P.2d at 1374. This process does not require a court to determine the amount due on the mortgage before granting a decree of foreclosure to the mortgagee.

an express directive on the method of calculation that enables a court to exercise discretion in determining the deficiency judgment, including applying, or not applying, the traditional method that the dissent appears to favor.

The dissent next relies upon 2012 "legislative history" to HRS § 667-1.5, a statute that the dissent acknowledges has essentially remained unchanged since its enactment in 1859.[23]  Dissent at 16-17.  Even if the legislative "history" cited by the dissent had been contemporaneous with the enactment of the 1859 version of the statute, resort to legislative history in this manner would only be appropriate if the word "may" in the statute were ambiguous.  Castillon, 144 Hawaiʻi at 411, 443 P.3d at 103 ("[W]here the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning." (quoting Panado, 134 Hawaiʻi at 11, 332 P.3d at 154)).  And assuming arguendo that the word "may" in HRS § 667-1.5 is ambiguous, reliance on a subsequent legislative committee report written 153 years after enactment of the statute underscores the criticism this approach has repeatedly garnered from the United States Supreme Court.  United States v. Texas, 507 U.S. 529, 535 n.4 (1993) ("[S]ubsequent legislative

---

[23]  The dissent describes the 2012 legislature as "the Legislature which most recently amended HRS § 667-1.5[.]"  Dissent at 18.  We observe that the only changes to HRS § 667-1.5 effected by the 2012 amendments were to the section number and title.  2012 Haw. Sess. Laws Act 182, § 3 at 648.

history is a 'hazardous basis for inferring the intent of an earlier' Congress." (quoting <u>Pension Benefit Guar. Corp. v. LTV Corp.</u>, 496 U.S. 633, 650 (1990))); <u>United States v. Price</u>, 361 U.S. 304, 313 (1960).[24]

The dissent's accusation of usurpation and judicial activism is therefore without any validity in light of our statutory law vesting such discretion in the circuit court and the equitable nature of foreclosure proceedings.[25]

Additionally, the dissent disagrees with our adoption of the Restatement's approach because "the new rule will not . . . protect both parties to the mortgage." Dissent at 10. However, the dissent's view has been overwhelmingly rejected by

---

[24] Additionally, the committee report in fact acknowledges the inequity of the traditional method of calculating deficiency judgments. <u>See</u> S. Stand. Comm. Rep. No. 3325, in 2012 Senate Journal, at 1075 ("Your Committee further notes that owner-occupants who lose their primary residences to foreclosure suffer harsh personal losses that leave them particularly susceptible in cases where the lender may pursue a deficiency judgment . . . . As such, owner-occupants should be provided with greater relief from deficiency judgments."). As the committee report noted, the tendency of the traditional method to produce inequitable results merited further discussion. <u>Id.</u> It is not surprising that the majority rule, which we adopt today, is cognizant of the concern articulated in the committee report and provides an equitable means to calculate the deficiency judgment in such cases.
     The dissent argues to the contrary, stating that the legislature "expressed concern about limiting lenders' ability to pursue deficiency judgments, even in the case of a displaced owner-occupant, due to the prevalence of borrowers refinancing their mortgages for more than the value of their home." Dissent at 17-18 (footnote omitted). Respectfully, the dissent misconstrues the legislature's apprehension, which pertained solely to "prohibiting" deficiency judgments, and not at all to consideration of a more equitable means to determine their amount.

[25] Indeed, in the Missouri case that the dissent relies upon, the court declined to reconsider the manner in which deficiency judgments are calculated substantially because Missouri lacked a statutory equivalent to HRS § 667-1.5. Dissent at 18-19; <u>First Bank</u>, 364 S.W.3d at 223.

---

43

the majority of jurisdictions, legal scholars, and the American Law Institute. See Washburn, supra, at 939 ("Fairness in the mortgage foreclosure process can be achieved only by balancing the rights of the mortgagee with the need to protect the mortgagor. The fulcrum of this balance is the market value of the foreclosed property."); Restatement (Third) of Property: Mortgages § 8.4 cmt. a (adopting position of the substantial number of jurisdictions providing the deficiency defendant with the right to have "the greater of the fair market value of the real estate or the foreclosure sale price be used in calculating the deficiency").

The dissent also posits that our adoption of the majority rule "will unnecessarily burden parties to a foreclosure action," and that tasking the trial court with assessing the fair market value of real property is unduly burdensome because it will "require[] additional time and force[] all parties to incur additional costs." Dissent at 20-21. Despite the dissent's speculative concerns, the experience of jurisdictions following the majority rule is quite the contrary:

> [W]e find no authority or data demonstrating that our trustee foreclosure laws would be unsettled were we to allow a trust deed grantor to challenge the value of real property at a deficiency judgment proceeding. A majority of states allow grantors to challenge the value of real property at a deficiency judgment proceeding. We have found no authority suggesting that the states that follow the majority rule suffer from unsettled foreclosure laws,

44

> nor have we found any data demonstrating that the banking
> institutions in those states have been negatively affected
> as a result of their jurisdictions adhering to the majority
> rule.

Sostaric, 766 S.E.2d at 404 (emphases added).  Moreover, any

administrative concerns entailed by our adoption of section 8.4

are more than offset by the equity and fairness gained in

determining a deficiency judgment based on the fair market value

of the property, as manifestly demonstrated by the widespread

adoption of the majority approach.[26]

The dissent further contends that our adoption of the

majority rule in this case is unwarranted because, "[t]he record

---

[26]     Further, our courts are already called upon to make financial determinations similar to assessing the fair market value of real property in many other contexts.  See, e.g., State v. Nelson, 140 Hawaiʻi 123, 134 n.14, 398 P.3d 712, 723 n.14 (2017) (deeds of real property used to secure a bail bond must have a market value at least twice the amount of the bail); Gordon v. Gordon, 135 Hawaiʻi 340, 349, 350 P.3d 1008, 1017 (2015) (division of real property for divorce); City & Cty. of Honolulu v. Steiner, 73 Haw. 449, 459, 834 P.2d 1302, 1308 (1992) (tax appeals); Burgess v. Arita, 5 Haw. App. 581, 589, 704 P.2d 930, 936-37 (1985) (damages for breach of land sale contract).  Parties may adduce evidence of the fair market value of the foreclosed-upon property in a variety of ways that do not entail significant additional expenditure.  See City & Cty. of Honolulu v. Int'l Air Serv. Co., 63 Haw. 322, 332, 628 P.2d 192, 200 (1981) ("Most courts presume an owner is familiar with his land and the market therefor and thus is competent to state an opinion of its value."); State v. Kunimoto, 62 Haw. 502, 507, 617 P.2d 93, 97 (1980) ("[R]ecent sales of similar real estate are admissible as evidence in condemnation cases, either as substantive proof of value of property taken or in support of an expert's opinion as to value."); Krog v. Koahou, No. SCWC-12-0000315, 2014 WL 813038 (Feb. 28, 2014) (mem.) (holding that a declaration of a real estate broker was properly admitted to prove the rental value of real property).
>      In response to the many authorities cited above, the dissent criticizes our citation to International Air Services Co. because "[n]either the mortgagee nor the mortgagor would be a disinterested party who could proffer an impartial opinion."  Dissent at 21 n.9.  But assessing the credibility of interested witnesses and the weight to be given to testimony is a core function of a trial court.  Additionally, this critique is equally applicable to any case in which parties retain expert witnesses.

shows that the deficiency judgment will not unjustly enrich the credit union." Dissent at 11.[27] In support of this contention, the dissent focuses on the fact that HawaiiUSA did not purchase the Property at the foreclosure auction. Id. The Restatement, however, rejects the requirement that the fair value determination be restricted to mortgagee purchasers. Section 8.4 instructs that

> limiting the application of the fair value determination to mortgagee purchasers may discourage mortgagees who contemplate obtaining deficiency judgments from taking part in the foreclosure bidding and hence may remove a significant impetus to higher bidding by third parties. In addition, even when a third party is the purchaser, the mortgagor may still suffer the unjustifiable double burden imposed by the loss of his or her real estate and an unfairly measured deficiency judgment. Consequently, under this section foreclosing mortgagees are subject to the fair value limitation on deficiency judgments irrespective of who purchases at the sale.

Restatement (Third) of Property: Mortgages § 8.4 Reporters' Note to cmt. b (emphases added). Thus, while section 8.4's primary purpose is "preventing the unjust enrichment of the mortgagee . . . . [section 8.4] also protects the mortgagor from the harsh consequences of suffering both the loss of the real estate and the burden of a deficiency judgment that does not fairly recognize the value of that real estate." Restatement (Third) of Property: Mortgages § 8.4 cmt. a. This second purpose is served even when a third party is the purchaser because the fair value determination protects the mortgagor from a deficiency

_____

[27] HawaiiUSA also argues that it did not secure a windfall profit over what was actually owed because it was not the purchaser of the Property.

judgment that does not fairly recognize the value of the lost real estate.[28]

We observe that both the dissent and HawaiiUSA argue that the deficiency judgment awarded against the Monalims fairly recognizes the value of the Property because the sale price at the foreclosure auction exceeded the City and County's valuation of the Property for purposes of tax assessment.  Dissent at 11.  The reliance by HawaiiUSA and the dissent on the tax-assessed value of the Property to demonstrate market value does not recognize the longstanding and "overwhelming weight of authority that assessed value is not competent direct evidence of value for purposes other than taxation."  C. C. Marvel, Annotation, Valuation for Taxation Purposes as Admissible to Show Value for Other Purposes 39 A.L.R.2d 209 §4[a] (1955); see also Mettee v. Urban Renewal Agency, 518 P.2d 555, 557 (Kan. 1974) ("Although the assessor is required to appraise the value of the property,

---

[28] The dissent claims incredulity of our adoption of the majority rule in this case.  Dissent at 10, 14, 22-23.  The dissent acknowledges, however, that in instances where, for example, (1) the lender is the purchaser, (2) the borrower alleges that the sale terms were unconscionable, or (3) the borrower alleges that the sale was conducted fraudulently, a court could be required to make a fair value determination when there are suggestions of inequity to ensure fairness to the borrower.  Dissent at 20 n.7.  But waiting for a case in which the mortgagee is unjustly enriched before adopting the majority rule is imprudent.  Our adoption of the majority rule shall be prospective only--as it would be in any subsequent case.  See infra pp. 49-51.  It would thus result in a greater injustice if we were to await a case in which the mortgagee receives an undue windfall and the borrower suffers the "harsh consequences" of "a deficiency judgment that does not fairly recognize the value of that real estate."  Restatement (Third) of Property: Mortgages § 8.4 cmt a.

it is an open secret that the assessment rarely approaches the true market value." (quoting 5 Nichols on Eminent Domain § 22.1 (3d ed.))).  For over a century, courts in this country have recognized that tax assessments of real estate are not always aimed at estimating fair market value, and even when that is the case it is well understood that the custom of assessors is to assess property in comparison with the surrounding land.  Wray v. Knoxville, L.F. & J.R. Co., 82 S.W. 471, 475 (Tenn. 1904) ("This court knows judicially and as a part of the financial history of the State that land is never assessed for purposes of taxation at its real cash market value, though that may be the law, but only in comparison with other lands around it[.]"); see also McClure v. Delguzzi, 767 P.2d 146, 148 (Wash. Ct. App. 1989) ("[N]otwithstanding statutory requirements, assessor's values were relative, not actual.").[29]  As such, the reliance by the dissent and HawaiiUSA on the tax-assessed valuation of the Property is misguided.  In fact, examination of the facts in this very case disabuses one of the notion that tax assessments accurately reflect market value.  The Monalims purchased the Property in 2008.  The mortgages the Monalims executed on the property at the time of sale were for the total amount of

---

[29]    Assessed values may also exceed market values.  See, e.g, Kuiters v. Cty. of Freeborn, 430 N.W.2d 461, 462 (Minn. 1988) (agricultural property in the county was assessed, on average, at 115% of its market value).

$1,025,100. The tax-assessed value of the Property in 2008 was $322,600.

In any event we need not resolve whether the deficiency judgment awarded against the Monalims fairly accounted for the value of the Property. Of more fundamental importance, there is little disagreement that the equitable considerations of foreclosure proceedings warrant affording the mortgagee the right to apply the fair market value of mortgaged property towards the amount due on the mortgage, as section 8.4 provides. The majority of jurisdictions and the growing consensus regarding a mortgagor's right to a fair market value determination firmly establishes that, by adopting section 8.4, we advance the fundamental fairness of foreclosure proceedings in Hawaiʻi, protect mortgagors from the double burden of losing their land and suffering an unfairly measured deficiency judgment, and enable mortgagees to be made whole.

Because our adoption of section 8.4 "announce[s] a new rule . . . we are free to apply this new rule with or without retroactivity."[30] Lewi v. State, 145 Hawaiʻi 333, 349 n.21, 452 P.3d 330, 346 n.21 (2019) (internal quotations and alterations omitted) (quoting State v. Jess, 117 Hawaiʻi 381, 401, 184 P.3d

_____

[30] We reject the Monalims' contention that procedural and substantive due process was violated in determining the amount of the deficiency judgment in light of the circumstances of this case.

49

133, 153 (2008)). Regarding the retroactive effect of our

holdings, we have adopted the following approach:

> This court has generally considered three primary
> alternatives in deciding to what degree a new rule is to
> have retroactive effect. First, this court may give a new
> rule purely prospective effect, which means that the rule
> is applied neither to the parties in the law-making
> decision nor to those others against or by whom it might be
> applied to conduct or events occurring before that
> decision. Second, this court may give a new rule limited
> or "pipeline" retroactive effect, under which the rule
> applies to the parties in the decision and all cases that
> are on direct review or not yet final as of the date of the
> decision. Third, this court may give a new rule full
> retroactive effect, under which the rule applies both to
> the parties before the court and to all others by and
> against whom claims may be pressed. . . .
>
> In exercising our discretion in deciding the effect of a
> new rule, we weigh the merits and demerits of retroactive
> application of the particular rule in light of (a) the
> purpose of the newly announced rule, (b) the extent of
> reliance . . . on the old standards, and (c) the effect on
> the administration of justice of a retroactive application
> of the new standards.

Id. (internal citations and quotations omitted). Here, we adopt

the majority approach to calculating deficiency judgments in

order to properly balance the equities between mortgagors and

mortgagees, protect mortgagors from double-loss by not fairly

recognizing the value of the foreclosed property, and prevent

undue windfalls at mortgagors' expense. However, parties have

relied on the finality of the many deficiency judgments that

have occurred within this state over the years, and allowing

petitions to reopen finalized deficiency judgments would impose

a significant effect on the administration of justice.[31]  See id.; see also HRCP Rule 60(b)(6) (permitting courts to upon motion relieve a party of final judgment for any "reason justifying relief from the operation of the judgment").  Therefore, our adoption of the majority rule is prospective in effect and applies only to foreclosure cases in which a

---

[31]  Citing federal caselaw, the dissent counsels that "we do not promulgate new rules to be applied prospectively only[.]"  Dissent at 13 n.4 (quoting James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 547 (1991) (Blackmun, J., concurring)).  Respectfully, the citation is simply inapposite because that case concerned "a newly declared constitutional rule," James B. Beam Distilling Co., 501 U.S. at 547 (Blackmun, J. concurring), and more significantly, the courts of this state are not subject to the limitations of the federal case and controversy requirement cited by Justice Blackmun.  Additionally, Justice Blackmun was not advocating against the prospective application of a new rule, instead he was arguing that the Court's decision was required to be applied both prospectively and retroactively.  It is also well settled that "[w]hen questions of state law are at issue, state courts generally have the authority to determine the retroactivity of their own decisions."  Garcia, 96 Hawaiʻi at 211, 29 P.3d at 930; State v. Yong Shik Won, 137 Hawaiʻi 330, 355 n.49, 372 P.3d 1065, 1090 n.49 (2015); Schwartz v. State, 136 Hawaiʻi 258, 272, 361 P.3d 1161, 1175 (2015).  Our decision to apply the holding in this case only prospectively is based on the application of the factors set forth in our precedent.  We note, at oral argument, HawaiiUSA's counsel specifically stated that if this court were "inclined to adopt the majority view and to adopt a new rule for calculating deficiency judgments . . . it should be prospective in application."  Oral Argument at 00:59:07-19, HawaiiUSA v. Monalim, (No. SCWC-16-0000807), http://oaoa.hawaii.gov/jud/oa/19/SCOA_011119_SCWC_16_807.mp3 [https://perma.cc/TBK2-9K9G].

In addition, this course of applying our decisions prospectively is one we have frequently followed when doing so is in the interests of justice.  See, e.g., Chen v. Mah, 146 Hawaiʻi 157, 177, 457 P.3d 796, 816 (2020) (applying a holding prospectively); State v. Torres, 144 Hawaiʻi 282, 295, 439 P.3d 234, 247 (2019) (same); State by Office of Consumer Prot. v. Joshua, 141 Hawaiʻi 91, 98-99, 405 P.3d 527, 534-35 (2017) (same); State v. Auld, 136 Hawaiʻi 244, 255-56, 361 P.3d 471, 482-83 (2015) (same); In re T.M., 131 Hawaiʻi 419, 319 P.3d 338 (2014) (same); State v. Hussein, 122 Hawaiʻi 495, 229 P.3d 313 (2010) (same); Jess, 117 Hawaiʻi at 404, 184 P.3d at 156 (same); Kahale v. City & Cty. of Honolulu, 104 Hawaiʻi 341, 348, 90 P.3d 233, 240 (2004) (same); Lindinha v. Hilo Coast Processing Co., 104 Hawaiʻi 164, 170, 86 P.3d 973, 979 (2004) (same); Tachibana v. State, 79 Hawaiʻi 226, 238, 900 P.2d 1293, 1305 (1995) (same); State v. Stanley, 60 Haw. 527, 533, 592 P.2d 422, 426 (1979) (same).

deficiency judgment is first entered after the date of this opinion.[32]

## IV. CONCLUSION

Based on the foregoing, we vacate the ICA's August 16, 2018 Judgment on Appeal, the circuit court's Order Granting Deficiency Judgment, and the Deficiency Judgment, and the case is remanded to the circuit court for proceedings consistent with this opinion.


Gary Victor Dubin                       /s/ Sabrina S. McKenna
(Frederick J. Arensmeyer
with him on the briefs,                 /s/ Richard W. Pollack
application, and reply)
for petitioners                         /s/ Michael D. Wilson



Thomas J. Berger
(Jonathan W.Y. Lai and
Tracey L. Ohta with him
on the briefs and response)
for respondent

---

[32] In the event a deficiency judgment is entered on remand, our adoption of the majority rule will not be applicable to the Monalims as the Deficiency Judgment was initially entered before the date of this decision.